## LINDE DREDGING CO. v. SOUTHWEST L. E. MYERS CO. et al.

### No. 6995.

Circuit Court of Appeals, Fifth Circuit.

Dec. 11, 1933.

Brantly Harris and David Watkins, both of Galveston, Tex., for appellant.

Clyde A. Sweeton and Thomas Fletcher, both of Houston, Tex., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellant, a subcontractor on the Copano Bay highway project, brought this suit against appellees, the contractors, to obtain payment for material its dredge had pumped onto an embankment in excess of the amount

estimated by the state engineers, and paid for by the highway commission of Texas.

Neither in the pleadings nor in the course of any of the proceedings in the lower court was any claim made against the state, or that it had not paid Myers, the contractor, all that was due by it under its contract. On the contrary, appellant conceded that it had.[1] The case was put entirely on the ground that the subcontract dated May 9, 1930, had definitely fixed the basis for payment as between the parties to it; that it and not the general contract, dated February 15, 1930, controlled, and that under its terms considerably more was due. We shall therefore, though appellant in the third proposition of his brief does argue that "Myers" has not been fully paid, confine ourselves to a determination of whether plaintiff had a different contract with Myers, and whether anything more was due plaintiff under it, regarding it as closed here that the state has fully paid what, under its contract, it was due to pay for the embankment.

The cause and the point of the controversy is to be found in the fourth paragraph of the joint bid or proposal which appellant and another dredging contractor had on January 17, 1930,[2] submitted to appellees when it was preparing to bid on a large amount of embankment and trestle work in the vicinity of Corpus Christi, including the Copano Bay project.

Appellant claims that all the negotiations, including the telegrams exchanged on the Copano Bay project before it moved its dredge there, and commenced to work, culminating in the wire of March 18, 1930, of which wire Mr. Linde said, "I would consider that the contract,"[3] were had on the basis of this proposal, and that, when the final subcontract came to be signed, thirty days after the commencement of the work, this proposal was carried forward in it, by this paragraph, which Warriner, its secretary treasurer, insisted on writing into the contract, and which was written into the seventh paragraph before he would sign it: "And subject especially to the joint proposal made by the Gulf Coast Dredging Company and Linde Dredging Company January 17, 1930 except that the price is as contained in paragraph 9."

Appellant claims that this insertion imported the fourth paragraph of the proposal into the subcontract, so that the subcontract thereafter read: "This quotation is based on that the dredge be permitted to work within 350 feet from the center line of the embankment and payments to be made for the natural slopes whatever the dredge will make, depending on the character of material. The

---

[1] "We have been paid for what the State agreed to pay the Southwest L. E. Myers Company." Plaintiff's counsel, p. 23 Tr.

"The Court: In other words, you say that the defendant had a contract with the highway commission on one basis?

"Mr. Harris: Yes sir.

"The Court: And you had a contract with the defendant on another basis?

"Mr. Harris: Yes sir, that is our contention; our basis is the natural slope that the material will take.

"The Court: And you have been paid on the basis of the Highway Commission contract?

"Mr. Harris: Yes sir.

"The Court: You have not been paid on the other?

"Mr. Harris: That is correct."

[2] "Gentlemen: In reference to the Port Lavaca and Rockport, Texas, projects we are quoting on the hydraulic embankments approximately 916,000 cubic yards a price of 35 cents per cubic yard, plus the State tax of 5 cents per cubic yard, total 40 cents per cubic yard. This includes our share of the bond at 1% and doing the work as near to grades, etc., as it can be done with a hydraulic dredge. To this you should add a reasonable charge for the use of a grader in smoothing up the embankments to what the engineer will require, say about one cent per cubic yard. Or this can be included in your price for preparing the subgrade for the shell surfacing.

"On the shell required for the shell surfacing approximately 9,000 cubic yards. If the material that the dredge pumps up is suitable for this then we will pump this up at a convenient point on the embankment in a pile where it can be hauled by trucks for a price of 65 cents per cubic yard, which includes the State tax.

"This quotation is based on that the dredge be permitted to work within 350 feet from the center line of the embankment and payments to be made for the natural slopes whatever the dredge will make depending on the character of material. The slopes called for in the specifications will be done as near hydraulically as the dredge can do it.

"We propose to use two or more different dredges ranging in sizes from 12 to 16″ if necessary.

"While on the subject permit me to say that we own several pile drivers, derrick barges, material barges, excavators, etc., that could be used on this work.

"The writer will be in Austin Monday at the Stephen F. Austin Hotel.

"Thanking you for the inquiry, and if you are the successful bidder we will be glad to go into further details with you.

"This is a joint proposal of this company and the Linde Dredging Company.

"Yours truly, Gulf Coast Dredging Company,

"Wm. P. Sweeney, S'cy-Treas."

[3] On February 13 and 14 several wires passed between Linde and Myers about the Copano job. These, concerned with arriving at a price per yard, quoted figures very much under those in the January proposal, and in none of them was that proposal referred to. These telegrams arrived at the price of 23½ cents per cubic yard. On March 17 Linde sent this message:

"Southwest L. E. Myers Co.: Dredge No. 5 ready to proceed Copano Bay. To avoid delay please wire formal contract giving full detail as to yardage and payments."

In answer to that telegram Myers wired on March 18: "Linde Dredging Company—This your authority to proceed with Copano Bay dredging approximately 292000 cubic yards price twenty three one half cents to include bond to us full coverage we to pay State tax 5 cents dress slopes one cent and pay bond to state. Shell surfacing delivered on slope sixty cents per cubic yard. Southwest L. E. Myers Co."

slopes called for in the specifications will be done as near hydraulically as the dredge can do it." It further claims that, by the insertion of that provision in the subcontract, it provided for payment for all material the dredge pumped onto the embankment whether it remained in or outside of the typical cross section the state, in its contract, had required for the embankment, and agreed to pay for. That though, therefore, "Linde" had in clause after clause of the subcontract agreed to do and perform that part of the general contract it had undertaken as called for in that contract, its plans and specifications, and to be paid for doing it according to the estimates of the engineers; in short, though Linde had by general and specific references imported the applicable portions of the main contract into the subcontract,[4] it had, by the insertion of the paragraph above quoted, effected an agreement with the general contractor which made Myers liable, not for the quantity of material placed in the embankment in accordance with the requirements of the plans and specifications, and as ascertained by the engineers, as Myers' contract and the subcontract in terms had agreed should be done, but for all the material pumped onto the embankment remaining within the natural slopes made by the action of the dredge, though the excess material formed no part of the embankment, as Myers by its contract and Linde by adopting that

---

[4] The written contract designated Myers as "contractor" and plaintiff as "subcontractor," under the contract Myers had with the highway commission to construct "a trestle and approaches in accordance with the terms of the agreement, and the drawings and specifications which are incorporated herein with the same force and effect as if set out herein verbatim." In the first paragraph of the subcontract it was agreed that the "subcontractor shall well and sufficiently perform, furnish and finish in a thoroughly workmanlike manner under the direction and to the satisfaction of the Contractor, the Engineers, and the Owner, as required by the terms of the contract, including all revision thereof to date, place all dredged embankment at locations and in the manner shown by the plans and specifications, and as required by the engineers and other representative of the State of Texas."

Paragraph 2 provided that, should the work intended to be done be not sufficiently detailed or explained, on the drawings or in said specifications, the subcontractor should apply to the engineers through the contractor for further details or explanations as may be necessary, and shall conform to them as part of the agreement.

The ninth paragraph provided: "If the subcontractor furnishes the material and well and faithfully performs the work agreed herein to be done and every part thereof, the contractor shall then pay to the subcontractor 23½ cents per cubic yard for all acceptable materials (Texas State Highway Engineers' estimates) delivered and placed in embankments, and 60 cents per cubic yard for all acceptable surfacing shell which may be required, delivered on the slope of the embankment (Texas State Highway Engineers' estimates to govern) subject to additions or deductions as herein provided."

contract had agreed to construct it, and though, because not in accordance with the contract, Myers was to receive no pay for it.

The District Judge, before whom the case, by waiver of jury, was tried, found the making of the contract and subcontract and that "because of the difficulty in a job of this size and kind in adhering precisely to the contract and specifications, and because of the physical conditions, an additional 54,478 cubic yards of earth was placed in the approaches by Linde Company, for which it has been paid nothing and which is the basis of this controversy," concluded that plaintiff's claim was without legal basis, because it was not in accordance with the agreement it had made with the contractor. He gave judgment for the defendant.

Appellant insists that the District Judge has deprived it of its own contract with Myers by holding it to the contract Myers had with the state. Citing cases like Guerini Stone Co. v. P. J. Carlin Construction Co., 240 U. S. 264, 36 S. Ct. 300, 60 L. Ed. 636, Cummings Const. Co. v. Marbleloid Co. (C. C. A.) 51 F.(2d) 906, Lisher v. Fairbanks, 70 Cal. App. 326, 233 P. 74, where the contract was not imported into and made a part of the subcontract, but was merely referred to for a limited purpose, it argues that they rule this case.

We do not think so. The cases controlling here are those which hold that, when a subcontractor agrees to do the work as provided for in the plans and specifications, and to be paid in accordance with them, and with the estimates of the engineers, these agreements, in the absence of the clearest kind of showing to the contrary, must be taken as evidencing the principal apparent purpose of the parties [Cocke v. Vacuum Oil Co. (Tex. Civ. App.) 63 F.(2d) 406] and the subcontractor must abide by them [Watson Co. v. Bleeker (Tex. Civ. App.) 283 S. W. 260].

Appellant, by every test of what constitutes a subcontractor within the strictest meaning of that term, was established by the evidence in this case to have been one. People v. Fidelity & Deposit Co. of Maryland, 232 Mich. 238, 205 N. W. 157, 158; People v. Valley Mantel & Tile Co., 200 Mich. 554, 166 N. W. 839; People v. Morrison, 228 Mich. 216, 199 N. W. 689; Watson Co. v. Bleeker, supra.

Not only the provisions in the subcontracts themselves, but the testimony as to how the work was done, makes it clear that Linde substituted for Myers in the making of the embankment, and that everybody so understood

it. Knowing that it did so, Linde made every effort to lay it down as the engineers required, even at times piling brush on the embankment to hold it within the typical slope which at some points was 10 to 1, and at others, 20 to 1. Knowing that it did so, the state engineers dealt with Linde at first hand, complaining at first of the material pumped to the fill, and later finding it acceptable. Knowing that Linde did so, in the final settlement Myers and the state undertook to satisfy all reasonable complaints of Linde, and did, according to the engineers, allow for subsidence and for other causes over 40,000 cubic yards more than were actually found in the typical cross section. Knowing this, Linde contended, and prevailed in its contention, that it must be allowed to work its dredge within 350 feet of the embankment, and to put it up hydraulically as near the slope required as its dredge would do it, and this was acceded to by the engineers. Knowing this, Linde at no time during the dredging, and not until dissatisfied with the final estimate, made the claim it now insists on that, though this was not in accordance with the contract Myers had, and which Linde had agreed to perform for him, it must be paid for the material it pumped on the embankment, which ran, floated, or settled beyond the embankment's typical slopes.

In the light of all these considerations, the claim Linde now makes that reference to the January 19 proposal operates to release it from the conditions of the subcontract which it by agreement and conduct has assumed may not prevail.

Passing the difficulty in its way arising out of the fact that the insertion of the reference in the context where it was found makes it meaningless, and the further difficulty that its generality also makes it meaningless, because referring to no particular part or paragraph of that proposal, it seeks to import an entire proposal which in its generality could have no relation to the particular work being signed up for, plaintiff finds itself confronted with the insuperable difficulty arising out of the fact that it seeks to give a meaning and effect to a proviso in it destructive of essential provisions of the subcontract appearing both earlier and later in it. It is a settled rule of law that such conflicts will be avoided if a reasonable construction of the whole instrument will permit, and that, if reasonable construction will not remove the conflict, that provision which, according to its place in the contract, its relation to it, and the conduct under and construction of it by the parties, is clearly shown

to be inconsistent with the main apparent purpose of the contract, will be rejected and disregarded. Thompson v. Waits (Tex. Civ. App.) 159 S. W. 82; St. Mary's Oil Engine Co. v. Allen-Morrow Co. (Tex. Civ. App.) 20 S.W.(2d) 266, 271; Prince v. Frost-Johnson Lbr. Co. (Tex. Civ. App.) 250 S. W. 785; Harper v. Hochstim (C. C. A.) 278 F. 102, 20 A. L. R. 1232; Employers' Liability Assurance Corp. v. Morrow (C. C. A.) 143 F. 750; Du Puy v. United States (Ct. Cl.) 35 F.(2d) 990.

We need not here go further in construction than to say that the provision may be given, in fact, has been given, reasonable and full effect by taking it to have reference to the position Linde has always assumed and maintained, that the dredge should be allowed to work within 350 feet of the embankment, and that the embankment should be laid down not precisely, but as near precisely, as a hydraulic dredge could do it. This gives the provision effect in regard to a matter, the use of dredges, which may be supposed to have been of the essence of Linde's proposal. It prevents its rejection altogether as undertaking to import into a contract, with the whole tenor of which it is at war, the agreement that the subcontractor should be paid for doing work in substitution for the contractor, for that part of the material its dredge pumped out, which was not a part of the embankment as contracted for, and for which therefore the contractor was to receive no pay.

In the Lisher Case, supra, comment was made on the unreasonableness of the contention there, that the subcontractor was bound by the contractor's interpretation, when the proof showed that the main contractor was getting pay for that which he refused to pay the subcontractor for, and for which he had provided a substantial profit in his contract. The converse is true here. Having only a small profit at best if it got paid for every yard Linde delivered, the contractor stands to lose heavily if the contract is construed as Linde construes it, to obligate Myers to pay for all material delivered to the embankment no matter in what part of the bay it finally came to rest, or how far it lay outside of the typical cross-sections which the contractor had agreed to fill and be paid for. Only the clearest, the most convincing proof that this was the agreement should be allowed to prevail over all of the contradictory appearances.

We think the record before us not only does not contain such clear and convincing proof, but that it really makes the other way.

The judgment of the District Court was right; it is affirmed.