HANLON-WATERS, INC., PETITIONER, *v.* UNITED STATES, RESPONDENT.

Docket No. 534–R. Promulgated May 29, 1953.

538

*Alexander M. Heron, Esq.*, for the petitioner.
*Frederick N. Curley, Esq.*, for the respondent.

540

## OPINION.

RAUM, *Judge:* In this proceeding the petitioner is contesting the unilateral determination of excessive profits for the year 1943 on two grounds: (1) that there were erroneously included therein profits earned by it under three contracts which had been previously renegotiated pursuant to the agreement dated July 16, 1943, and (2) that the order entered on behalf of the respondent determining excessive prof-

its for 1943 was not entered within 1 year following the commencement of renegotiation.

1. The petitioner's first contention is that the effect of the agreement of July 16, 1943, was to remove from consideration by the War Contracts Price Adjustment Board, in connection with the renegotiation of its business for the year 1943, the proceeds and profits derived from the three contracts enumerated in paragraph III of the agreement. It argues that paragraph VI constituted a final and conclusive determination of its excessive profits under these contracts to the extent set forth in paragraph III for the year 1943, which should be eliminated, subject to the right of the Under Secretary of War, in his discretion, to reopen the renegotiation if the data furnished by it pursuant to paragraph V showed the actual results of its operations to be materially at variance with the estimates on which the finding was based. Petitioner urges that the right to reopen was a contractual right reserved to the Under Secretary in a renegotiation agreement; that it could be exercised only in accordance with the terms of the agreement; that the Under Secretary never exercised his discretion and no reopening was ordered by him; that SWEPAB in the letter of June 5, 1944, purported to exercise the authority of the War Contracts Price Adjustment Board, when it advised petitioner that all matters in anywise relating to a consideration of its business for the fiscal year 1943 "pursuant to the Renegotiation Act, shall be and are hereby reopened"; that this effort by the Board "pursuant to the Renegotiation Act" was an effort to exercise authority which the Board did not possess; and that the finding of the unilateral order covering its fiscal year ended December 31, 1943, improperly included $599,268.46 of profits attributable to the three contracts.

The respondent contends that the agreement of July 16, 1943, was a final and conclusive renegotiation agreement as to 1942 and was merely a repricing agreement for existing enumerated contracts to be performed by petitioner during 1943; that petitioner and SWEPAB agreed in paragraph VI that the agreement was final and conclusive as to (a) 1942 and (b) the contracts and purchase orders enumerated in paragraph III "to the extent as set forth in Paragraph III * * * for * * * 1943"; that by paragraph III, SWEPAB made no representation or agreement that the refund of 22½ per cent of "actual net sales" on the three contracts would accomplish the complete elimination of excessive profits from those contracts; that both parties specifically agreed therein that the provisions of that paragraph were without prejudice to the right to renegotiate subsequently all of petitioner's profits for any year after 1942, including profits from the three contracts during 1943; that the agreement was not and was never intended to accomplish the renegotiation of any of petitioner's 1943

income whether such income was derived from the three contracts or other sources; and that, if it was necessary, the Under Secretary of War properly reopened petitioner's 1943 renegotiation in accordance with the terms of paragraph VI of the agreement. The respondent also urges that if the agreement constituted a renegotiation agreement for the enumerated contracts for 1943, SWEPAB was without authority to execute it.

SWEPAB, as delegate of the renegotiating authority, was authorized in the early part of 1943 to renegotiate the petitioner to determine whether it realized excessive profits which should be eliminated in connection with its renegotiable business for 1942. This renegotiation disclosed that the petitioner had realized from its war contracts during 1942 excessive profits in the amount of $556,000 which should be recaptured. The Renegotiation Act of 1942 [3] was designed not only to recover excessive profits for the period under review (in this instance 1942) but also to prevent the accrual of excessive profits "likely to be realized." Section 403 (c) (4).[4] Having ascertained that petitioner's war contracts yielded excessive profits during 1942 SWEPAB took up with the petitioner the matter of reducing prices upon deliveries under its war contracts subsequent to 1942, which was from time to time referred to in the negotiations as "forward pricing." The result was an agreement which not only determined the amount of petitioner's excessive profits for 1942 which should be eliminated (paragraph I) but which also required petitioner to reduce its prices on deliveries to be made under three enumerated contracts subsequent to 1942 by refunding or crediting 22½ per cent of the actual net sales from these contracts (paragraph III).

The petitioner would have us interpret the provisions of paragraph VI of the agreement in such a manner that the 22½ per cent refund or credit provided for in paragraph III would constitute a final and conclusive determination of profits derived from the three contracts during 1943, which should be eliminated. We are convinced that this

---

[3] Sec. 403 of the Sixth Supplemental National Defense Appropriation Act, 1942 (Public 528, 77th Cong.), approved Apr. 28, 1942, as amended by sec. 801 of the Revenue Act of 1942 (Public 753, 77th Cong.), approved Oct. 21, 1942; by the Military Appropriation Act, 1944 (Public 108, 78th Cong.), approved July 1, 1943; and by Public 149, 78th Cong., approved July 14, 1943.

[4] Section 403 (c) (4) provides:

Upon renegotiation pursuant to this section, the Secretary may make such final or other agreements with a contractor or subcontractor for the elimination of excessive profits and for the discharge of any liability for excessive profits under this section, as the Secretary deems desirable. Such agreements may cover such past and future period or periods, may apply to such contract or contracts of the contractor or subcontractor, and may contain such terms and conditions, as the Secretary deems advisable. Any such agreement shall be final and conclusive according to its terms; and except upon a showing of fraud or malfeasance or a wilful misrepresentation of a material fact,

    (i) such agreement shall not be reopened as to the matters agreed upon, and shall not be modified by any officer, employee, or agent of the United States; and

    (ii) such agreement and any determination made in accordance therewith shall not be annulled, modified, set aside, or disregarded in any suit, action, or proceeding.

would not give effect to the intention of the parties as expressed in the agreement and as reflected in the negotiations which preceded its execution. At the time the agreement was executed no actual figures were available which would permit the final determination of the profits from the three contracts which should be eliminated. It is apparent from the provisions of paragraph III that the 22½ per cent credit or refund represented merely an estimate of the amount necessary to eliminate excessive profits from these contracts. The respondent did not enter into any agreement that such credit or refund would fully accomplish this result, and in the concluding sentence of paragraph III the parties agreed that the provisions of that paragraph should be "without prejudice to subsequent renegotiation * * * relating to any fiscal year subsequent to the fiscal year ending December 31, 1942." Thus the parties clearly indicated that the provisions of paragraph III were to be final, only to the extent that they required the 22½ per cent refund or credit, and left the renegotiating authority free to recapture by subsequent renegotiation any excessive profits that the required refund or credit did not eliminate.

The first part of paragraph VI neither adds to nor detracts from the provisions of paragraph III for it provides that the finding (in paragraph III) shall be deemed a final and conclusive determination of the profits under the contracts "to the extent as set forth in paragraph III hereof for the fiscal year 1943," which should be eliminated. Inasmuch as paragraph III made no final and conclusive determination as to the profits under the contracts, in excess of the 22½ per cent refund, which should be eliminated, the effect of this provision of paragraph VI is to make the finding in paragraph III a final and conclusive determination of profits which should be eliminated only to the extent of the 22½ per cent refund.

Paragraph VI also provides that the Under Secretary of War or his duly authorized representative should have the right "to reopen the renegotiation in his discretion at any time within sixty (60) days after the contractor shall have filed with the Under Secretary of War a statement of financial statements provided for in paragraph V herein, if the actual figures with respect to such factors as cost, volume or production and nature of products prove to be materially at variance with the estimates on which the finding herein was based * * *." The finding referred to was the provision in paragraph III for the 22½ per cent refund. Why a provision "to reopen the renegotiation" to determine the amount of any excessive profits which the 22½ per cent refund did not eliminate was inserted in paragraph VI is not clear since renegotiation to determine such profits was expressly kept open in the last sentence of paragraph III. Renegotiation as to them

never having been closed, no reopening of the renegotiation was necessary. The provision for reopening, in paragraph VI, to the extent that it might relate to the three contracts, therefore could serve no useful purpose.[5] The fact that petitioner would not agree to its elimination, and that it was a part of the agreement executed, did not nullify the agreement of the parties as set forth in the concluding sentence of paragraph III. Therein the parties, by clear and unambiguous language, agreed that the 22½ per cent refund or credit was not to affect or restrict "subsequent renegotiation * * * relating to any * * * year subsequent to * * * 1942." Section 403 (c) (4), footnote 4, *supra*, provides for finality of the agreement "according to its terms." Here, however, the controlling "terms" of paragraph III left open the renegotiation of profits for 1943 and later years. Accordingly, the War Contracts Price Adjustment Board, the renegotiation authority under the Renegotiation Act,[6] properly considered the income from these contracts when it determined the petitioner's excessive profits for the year 1943.[7] It is therefore unnecessary to consider respondent's further contentions that the Under Secretary of War properly "reopened" petitioner's 1943 renegotiation in accordance with the terms of paragraph VI, or that if the agreement of July 16, 1943, constituted a renegotiation with respect to 1943, SWEPAB had no authority to execute it.

2. The remaining contention of the petitioner is that the entry of the unilateral order on December 14, 1945, was made after the expiration of the 1-year period of limitation provided in section 403 (c) (3) of the Renegotiation Act,[8] and that the time extension agreement of

[5] If it be assumed that paragraphs III and VI are in conflict, it is a recognized canon of construction that where repugnant clauses of a contract are irreconcilable, that provision which expresses the chief object and purpose of the contract must prevail, and other provisions subordinate to such object and purpose must give way. Cf. *Linde Dredging Co.* v. *Southwest L. E. Myers Co.,* 67 F. 2d 969, 972 (C. A. 5).

[6] Section 403 of the Sixth Supplemental National Defense Appropriation Act of 1942 (Public 528, 77th Congress), as amended, was comprehensively amended by Section 701 of the Revenue Act of 1943 (Public 235, 78th Congress), enacted Feb. 25, 1944, and became the "Renegotiation Act."

[7] Since the determination before us relates to the entire year 1943, which had not previously been the subject of renegotiation proceedings, and since it is undisputed that it undertakes to deal comprehensively with all profits realized by petitioner in 1943 that were subject to renegotiation, the decision in *Maguire Industries, Inc.* v. *Secretary of War,* 12 T. C. 75, is not applicable here.

[8] (3) No proceeding to determine the amount of excessive profits shall be commenced more than one year after the close of the fiscal year in which such excessive profits were received or accrued, or more than one year after the statement required under paragraph (5) is filed with the Board, whichever is the later, and if such proceeding is not so commenced, then upon the expiration of one year following the close of such fiscal year, or one year following the date upon which such statement is so filed, whichever is the later, all liabilities of the contractor or subcontractor for excessive profits received or accrued during such fiscal year shall thereupon be discharged. If an agreement or order determining the amount of excessive profits is not made within one year following the commencement of the renegotiation proceeding, then upon the expiration of such one year all liabilities of the contractor or subcontractor for excessive profits with respect to which such proceeding was commenced shall thereupon be discharged, except that * * * (B) such one-year period may be extended by mutual agreement.

December 19, 1944, did not serve to cure this defect because it was an agreement between the General Finance Corporation and the respondent, and not between the petitioner and the respondent.

The parties to the extension agreement were the General Finance Corporation and the respondent, and it was signed for General Finance Corporation by the chairman of its board of directors pursuant to authority conferred upon him by resolution of the board adopted at its meeting on December 16, 1944. The agreement provided as follows:

(1) Renegotiation pursuant to the Renegotiation Act between the War Contracts Price Adjustment Board or its duly authorized representative and the Contractor with respect to amounts received or accrued by the Hanlon Waters, Inc. division of the said General Finance Corporation for the fiscal year ended the 31st day of December 1943, was commenced the 5th day of June 1944.

(2) In accordance with the provisions of clause (B) of the second sentence of subsection (c) (3) of the Renegotiation Act, the time within which a determination of the amount of excessive profits, if any, derived by the Contractor from contracts with the Departments and subcontracts for the Contractor's fiscal year ended the 31st Day of December 1943, may be made by agreement or order is hereby extended to and including the 31st day of December 1945.

Since the order herein was entered on December 14, 1945, within the period as extended by the foregoing agreement, it was timely unless the agreement itself was ineffective. We think that the agreement was a "mutual agreement" within the meaning of section 403 (c) (3) (B), footnote 8, *supra*, and that it therefore effectively extended the period of limitations to December 31, 1945. The only circumstance relied upon to challenge the validity of the agreement is that it was executed in the name of General Finance Corporation. In the light of the facts before us, we hold that this circumstance did not prevent the agreement from being a "mutual agreement" within the meaning of the statute.

As of March 31, 1944, petitioner's sole stockholder, General Finance Corporation, acquired all of its assets, assumed its liabilities, and it was dissolved. Thereafter General Finance Corporation operated the former facilities of the petitioner under the same management as the Hanlon-Waters Division, General Finance Corporation. Even though the statutory provisions of the Delaware Corporation Law relating to mergers [9] may not have been fully complied with, the transfer as effected resulted in a de facto merger and the corporate personality of the petitioner was "drowned" in that of the General Finance Corporation. Cf. *Helvering* v. *Metropolitan Edison Co.*, 306 U. S. 522, 529; *Drug, Inc.* v. *Hunt*, 35 Del. 339, 168 A. 87, 96. After the combination of the two corporations petitioner retained a bare technical existence for the purpose of winding up its affairs, and it could have been sued by any person to whom it was liable.

[9] Secs. 59, 59A, and 60, Delaware Corporation Law.

Sec. 42, Delaware Corporation Law.[10] For all practical purposes, however, it had ceased to exist. It had no assets and the General Finance Corporation was answerable for its liabilities. After March 31, 1944, all of the negotiations with the respondent relating to petitioner's 1943 renegotiation were conducted by representatives of the General Finance Corporation, and, pursuant to authorization of its board of directors, the chairman of the board executed the extension agreement.

The provisions of the agreement clearly indicate that its purpose was to extend the time within which a determination of excessive profits could be made against petitioner to December 31, 1945. At the time it was executed the petitioner was dissolved and its identity submerged in that of the General Finance Corporation. There is no indication that any receiver or trustee was appointed who could act for the petitioner in the proceedings to determine its excessive profits, if any, for the year 1943.[11] The only person or entity that could be adversely affected by such a determination was General Finance Corporation. If it, as successor of petitioner and the real party in interest, could not act for the petitioner in the execution of the "mutual agreement" specified in section 403 (c) (3) (B), it is difficult to see who could. We hold that the agreement in question was a "mutual agreement" within the meaning of the statute, and that it is a matter of no moment whether General Finance Corporation be regarded as acting on behalf of petitioner or on behalf of itself.[12] The extension agreement was effective to extend the statutory period to December 31, 1945, and since the order was entered within the period as extended it was timely.

[10] Sec. 42. All corporations, whether they expire by their own limitation, or are otherwise dissolved, shall nevertheless be continued for the term of three years from such expiration or dissolution bodies corporate for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital stock but not for the purpose of continuing the business for which said corporation shall have been established * * *.

[11] See section 43 of the Delaware Corporation Law.

[12] In upholding the validity of waivers by a consolidated corporation in *Oswego Falls Corporation*, 26 B. T. A. 60, affirmed, 71 F. 2d 673 (C. A. 2), it was said (26 B. T. A. at 66) :

"The waivers in question, we think, were valid and must be given effect according to their terms. At the respective dates of execution of these waivers the original taxpayer corporations had long been dissolved as a result of the act of consolidation (see *People v. New York etc. R. Co.*, 29 N. E. 959 ; *People v. Rice*, 28 N. E. 251) and the tax liabilities therein referred to were then the direct, legal liabilities of the petitioner corporation imposed upon it by the provisions of the New York statute, hereafter discussed, under which it was created. No other person, either individual or corporate, was directly or indirectly interested as taxpayer in the matter of the correct determination and assessment of such liabilities, and, while the petitioner purported to act as the agent, beneficiary or successor of the dissolved corporations, the fact remains that it was acting solely as principal in its own behalf and for its own benefit. And all these facts were well known to both parties to the waivers. The fact that the petitioner, through an erroneous conception of the law, executed the instruments in a technically incorrect capacity, should not, in our opinion, be held to nullify the clearly indicated intention of the parties and to render invalid the consent agreements under which both acted in apparent good faith."

The unilateral determination that the petitioner had excessive profits for the year ended December 31, 1943, which should be eliminated, in the amount of $1,202,539.70, is approved. The parties have stipulated that $398,016.50 of this amount was eliminated by a prepayment on October 2, 1945, and that the balance due is $804,523.20.

*An order will issue in accordance herewith.*