# GUERINI STONE CO. v. P. J. CARLIN CONSTRUCTION CO.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR PORTO RICO.

No. 78. Argued November 12, 1915.—Decided February 21, 1916.

In the case of sub-contracts, as in other cases of written agreements, a reference to an extraneous writing for a particular purpose makes it a part of the agreement for that purpose only.

In this case, *held* that the general contract between the Government and the contractor was not admissible as against a sub-contractor except for the specific purpose mentioned in the subcontract, to wit; showing what drawings and specifications were referred to therein, nor was the sub-contractor bound by provisions in the general contract so as to be obliged to submit to delays resulting from the action of the Government permitted by the original contract.

Where a contractor agrees with a sub-contractor to provide labor and materials not included in the sub-contract he assumes an obligation not conditioned on the question of his fault; and whether the delay in supplying such labor and materials be attributable to him or to the exercise by the owner of a right reserved by the principal contract, he remains liable under the sub-contract.

In this case *held* that although the principal contract between the Government and the contractor gave the Government the right to suspend, as the contractor had not safeguarded himself by incorporating that provision into the sub-contract, he was not relieved from the damages caused the sub-contractor by such suspension.

In estimating profits that might be realized if a building contract had been proceeded with in the ordinary manner to completion, no more definite and certain method can be adopted than to deduct from the contract price the probable cost of furnishing the materials and doing the work.

A provision in a sub-contract requiring the contractor to make monthly payments not exceeding 85% of cost of work erected cannot be construed to require precisely that percentage; nor can a provision that the sub-contractor furnish requisitions of the amount to be paid make the sub-contractor sole judge of the amount it is en-

titled to receive. Such provisions must receive reasonable construction.

Where the form of a request to instruct is such that compliance with it might mislead the jury, there is no error in refusing it.

THE facts, which involve the rights and liabilities of a sub-contractor on government work, are stated in the opinion.

*Mr. Edward S. Paine* for plaintiff in error.

*Mr. Francis H. Dexter* for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

We have here under review a judgment for damages in favor of plaintiff in error (also plaintiff below) against defendant in error (also defendant below), reversal being asked upon the ground that, through erroneous rulings made by the trial judge, the recovery was unduly limited. The writ of error was sued out under § 244, Jud. Code (act of March 3, 1911, c. 231; 36 Stat. 1087, 1157), prior to the act of January 28, 1915 (38 Stat. 804, c. 22, §§ 3 and 6).

Defendant, a corporation of the State of New York, on December 12, 1910, secured a contract with the Government of the United States for the construction of a post-office and court building at San Juan, Porto Rico. A few days later it entered into a sub-contract in writing with one Guerini, by the first paragraph of which he agreed: "To furnish and set in position, including the concrete backing, all the imitation of sandstone, and to construct the interior concrete walls, concrete floors, concrete roof, backing the granite construction, enclosing all the I beams . . . agreeable to the drawings and specifications made by the said architect (copies of which have been delivered to the Sub-Contractor), and to the dimensions and explanations thereon, therein and herein

contained, according to the true intent and meaning of said drawings and specifications," etc.; it being agreed that the work should be done "under the direction and to the satisfaction of the General Contractors and James Knox Taylor, Architect (acting as Agents of the Owner) or his, or its representative."

A subsequent paragraph reads as follows:

"25th. The Sub-Contractor further agrees to furnish the material and build the concrete footing complete to the basement floor for the sum of $6.70 a cubic foot.

"Also to furnish the materials and build all the sidewalks for the sum of $1.85 a square yard.

"Also set in position all the granite walls, steps, balusters, buttresses and curbing, and all other granite work for the sum of 40 cents a square foot surface. The three above items to be at the option of the general contractor. . . ."

Thereafter the plaintiff corporation was formed under the laws of Massachusetts, and Guerini transferred the contract to it. Defendant was notified of this, expressed satisfaction in writing under date February 20, 1911, and thereafter dealt with plaintiff as sub-contractor.

At a later time, defendant exercised the third only of the options given to it by the twenty-fifth paragraph.

The plan of the building contemplated a foundation of concrete and piles, which was to be constructed by defendant complete to the basement floor; above this a basement story, surfaced with granite blocks to be furnished by defendant (as a practical matter, to be sent from the United States) and to be set in position by plaintiff under the accepted option. The blocks were to be backed with concrete, to be furnished and set by plaintiff. Above the basement story, the exterior walls were to be faced with imitation sandstone, backed with concrete, which together with interior walls, floors, and roof of concrete were to be constructed by plaintiff.

The contract contained the following clauses that bear upon the matters in dispute:

"6th. The Sub-Contractor shall and will proceed with the said work and every part and detail thereof in a prompt and diligent manner, . . . and shall and will wholly finish the said work according to the said drawings and specifications and this contract in 300 days from the date upon which the building is ready to receive his work and after he has been notified to proceed by General Contractors, and in default thereof, the Sub-Contractor shall pay the General Contractors the sum of twenty dollars for every day thereafter that the said work shall remain unfinished as and for liquidated damages. The Sub-Contractor further agrees to begin work at the building within three days from the time that he is notified by the General Contractors that the building is ready to receive such work.

"7th. . . . Should the Sub-Contractor be obstructed or delayed in the prosecution or completion of the work by neglect, delay or default of the Owner, the Architect, the General Contractors, or of any other contractors employed by them upon the work, or by alterations which may be required in said work, or by any damages which might happen by fire, lightning, earthquake, or cyclone, or by the abandonment of the work by the employees through no fault of the Sub-Contractor, then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all of the causes aforesaid," etc.

"11th. The General Contractors will provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in the event of failure so to do, thereby causing loss to the Sub-Contractor, agree that they will reimburse the Sub-Contractor for such loss; and the Sub-Contractor agrees that if he shall delay the material progress of the work so

as to cause any damage for which the General Contractors shall become liable, then he shall make good to the General Contractors any such damage over and above any damage for general delay, herein otherwise provided; the amount of such loss or damage in either case, to be fixed and determined by the Architect, or by arbitration, as provided in Article 3rd in this contract.

"12th. It is hereby mutually agreed by the parties hereto that the sum to be paid by the General Contractors to the Sub-Contractor for said work and materials shall be sixty-four thousand seven hundred and fifty dollars ($64,750.00) subject to additions or deductions as hereinbefore provided, and that such sum shall be paid in current funds by the General Contractors to the Sub-Contractor in monthly payments on account, not to exceed in amount 85 per cent. of the cost of the work actually erected in the building, provided that the Sub-Contractor furnishes to the General Contractors a written requisition, on a form to be supplied by the General Contractors, not less than twelve days before payment is required, . . . "

The action was commenced in June, 1912. The complaint, besides the jurisdictional averments, alleged the making of the contract between Guerini and defendant, the assignment to plaintiff and defendant's consent and recognition of plaintiff as the contracting party; averred that thereafter and during the month of February, 1911, at defendant's request and in pursuance of the terms of the contract, plaintiff employed and sent to Porto Rico its representatives, brought laborers from the United States and employed others in Porto Rico, organized its working forces, purchased and supplied the necessary tools and materials, and prepared itself and was ready and willing to perform its obligations under the contract, but that thereafter until the sixteenth day of October, 1911, plaintiff was not permitted by defendant to proceed with the work, owing to defendant's failure to provide the neces-

sary granite blocks; that on that day plaintiff did proceed with all possible diligence and performed all the work provided for by the contract as fast as defendant in the course of construction work permitted plaintiff to do so; that nevertheless during the period from October 16, 1911, until March 9, 1912, the work was unreasonably and unjustifiably delayed by the failure of defendant to provide necessary materials and carry on its part of the construction work so as to permit plaintiff to perform the work required of it under the contract, and that plaintiff was thereby greatly damaged; that on March 9, 1912, all work of every nature was stopped on the building, and plaintiff was prevented by defendant from continuing with any work; that said stoppage "has continued ever since, is still continuing, and  .  .  .  will continue for a period of at least several months hereafter," and that defendant has accordingly committed a breach of its obligations under the contract, the result of which has been and is to cause great damage and loss to plaintiff, which has been obliged to keep its labor force on hand during all of said period at great loss and expense; that by the terms of the contract payment of not more than 85% of the amount of the work actually done was due and payable by defendant monthly on 12 days' notice from plaintiff to defendant, and that plaintiff during the months of December, 1911, and January and February, 1912, duly notified and demanded of defendant payment of the sums due for the work actually performed, but that defendant continuously and repeatedly failed and refused to make said payments; that because of said repeated violation and breach of the contract on the part of defendant, plaintiff, under date of May 22, 1912, notified defendant in writing of its election to terminate the contract and bring its action for damages for breach thereof; and that plaintiff has offered to defendant to arbitrate their differences, but that defendant has refused.  Plaintiff claimed damages to the amount of

$45,797.45 for work and labor performed, materials furnished, and moneys expended in and about the performance of the contract, and for lost profits. In a separate paragraph an indebtedness of about $40,000 was alleged, for the reasonable value of work, labor, and materials supplied.

Defendant answered, admitting some of the averments of the complaint, but denying that plaintiff had complied with the terms of the contract or had been prevented by defendant from proceeding with and carrying on its work; admitting that plaintiff notified defendant of its election to cancel or rescind the contract and bring its action for damages for the alleged breach thereof, but denying that there was cause for rescission, and denying that plaintiff had sustained damages as claimed by it. The answer further set up that the sub-contract was subject to all the terms and conditions of the principal contract made between defendant and the Government of the United States; that defendant had at all times proceeded strictly in accordance with the terms and conditions of the latter contract, that during the course of the construction of the building the representatives of the Government found it desirable or necessary to change the manner of constructing the foundations, and that this action of the Government was within its rights under the original contract, and plaintiff was bound thereby equally with defendant.

The case was tried before the judge of the District Court and a jury. Plaintiff introduced evidence tending to support the material averments of its complaint. It appeared that in January, 1911, defendant notified plaintiff's predecessor that "work must start at once," and that in February plaintiff sent its representatives to Porto Rico; that upon their arrival so little work had been done upon the foundations that they were unable to do anything upon the building itself, but preliminary work was done in the way of getting tools and machinery to the Island, building

workshops and an office, and preparing moulds for the casting of the artificial stone; that during the spring and summer delay was occasioned by the failure of defendant to construct the foundations; that this continued until about the first week in October, when the foundation work and the grading inside the foundation walls had pro-- ceeded to a point that would admit of the commencement of the course of granite, and enough granite was upon the ground to allow a start to be made of setting it. In August or September plaintiff was notified of defendant's accept- ance of the option to call upon plaintiff to set the granite at 40 cents per square foot, but the granite was slow in arriving, and some of the stones were misfits, so that the work of laying was considerably interrupted. There was difficulty also with the derrick equipment, defendant having under the contract furnished two derricks and an engine, but with insufficient power to admit of operating both derricks at the same time. This was remedied, some time in December, by the provision of additional power. The granite setting proceeded from the middle of October to February 12, 1912, plaintiff's evidence being to the effect that it was set as fast as delivered, but that because the granite came in separate shipments, a little at a time, sometimes with needed blocks missing, the work of setting it could not be speeded. On or about February 12, 1912, plaintiff stopped setting granite, with defendant's consent.

The evidence tended to show that much of the delay during the spring and summer of 1911 was occasioned by a change made by arrangement between defendant and the Government in the provisions of the general contract respecting the mode of constructing the foundations. The pleader would seem to have limited the complaint respect- ing delay prior to October 16, 1911, to such as was due to defendant's failure to provide granite blocks, but the evidence was not thus limited.

In February, 1912, when the granite work had been

practically finished, it was ascertained that the foundations had settled, and that there were variations in the foundation work from the specifications as agreed upon between the Government and defendant. On March 9 work was suspended by order of the Government, pending an investigation which resulted in showing that practically the entire building would have to be underpinned in order to secure a safe foundation. This result was officially communicated to defendant under date March 25, 1912, and a few days later, pursuant to an order of the Assistant Secretary of the Treasury, all work upon the building was stopped "pending the settlement of responsibility for deviations from contract requirements regarding foundations." The question of responsibility lay between defendant and the representatives of the Government; plaintiff having had nothing to do with the foundations. Leaving the question undetermined, the Government, in the month of May, 1912, entered into an agreement with defendant for underpinning the entire building. It perhaps does not clearly appear when this work was commenced, but it was in progress when the action was begun, and Mr. Berryman, the Government's superintendent of construction then in charge of the building, testified: "This work is now [November, 1912] about 85 per cent. completed." The same witness testified that from March 9, 1912, until the time of the trial, "conditions were such that it was impossible for the Guerini Stone Company to continue with their work under the contract."

On March 9, 1912, plaintiff's agent at San Juan was notified by defendant's representative there that the Federal authorities had ordered all work upon the building suspended pending investigation of the foundations. On the same day he wrote defendant's San Juan office asking whether plaintiff's men should be discharged and sent back to the United States, but got no satisfactory reply. Further correspondence upon the same topic led to no result.

Meanwhile, the parties had been in disagreement about payments on account. The contract (paragraph 12) provided for payment of the contract price "in monthly payments on account, not to exceed in amount 85 per cent. of the cost of the work actually erected in the building, provided that the Sub-Contractor furnishes to the General Contractors a written requisition, on a form to be supplied by the General Contractors, not less than twelve days before payment is required," etc. The contract, however, did not provide how the cost of the work other than the granite setting should be ascertained. For the concrete backing and other concrete work and the imitation sand-stone covered by the sub-contract, no "unit prices" were specified. The price of "6.70 a cubic foot," mentioned in the twenty-fifth paragraph as the optional price for concrete footings, was treated by the parties as if intended to read $6.70 per cubic *yard*—approximately 25 cents per cubic foot. This, however, had reference to work that plaintiff was not called upon to do, and obviously did not furnish a unit price· for the concreting actually done by plaintiff.

In December, 1911, and January, 1912, plaintiff made written requisitions for payments on account, based upon statements of the "amount of work completed to date." They were not complied with, and the parties soon realized the practical importance of agreeing upon a unit price to be employed in estimating the amounts payable. According to the testimony of Mr. Converse, President and Treasurer of the Guerini Company, he went from Boston to New York City on February 2, 1912, by appointment, and conferred with Mr. Carlin, defendant's representative, upon the subject of unit prices, and it was then agreed that plaintiff should make its applications and receive its payments upon the basis of a certain written schedule of units, produced by Mr. Carlin, which specified (*inter alia*): "Exterior and interior concrete walls, arches and cement

work, $1.07 per cu. ft.; Concrete floors and casings, 45½c per sq. ft." Mr. Carlin, in his testimony, denied that such an agreement was made, but admitted that the schedule had been agreed upon between defendant and the Government's superintendent of construction and used as a basis for payments by the Government to defendant, including payments for the work done by plaintiff under the sub-contract. At the interview of February 2, Mr. Converse received a check for $3,765.50 on account, as against $12,750.00 previously called for. Under date of March 9th a requisition for $11,735.95 was made, and against this a payment of $674.00 was made about two weeks thereafter. No other payments were made to plaintiff. It appeared, however, that for the work theretofore done by plaintiff, defendant had received from the Government at least $13,871.25 (a witness called by defendant said "about $19,000"), based upon the price of $1.07 per cubic foot for concrete. It was explained that this unit price was fixed by the first superintendent of construction, who had charge during the year 1911 and the first month of the following year, and that his successor, who took charge on February 1, 1912, employed a lower unit price, on the basis of which the Carlin Co. had been overpaid about $8,000.

Enough has been said to indicate the situation as it stood on May 22, 1912, on which date plaintiff wrote to defendant reciting briefly its complaints respecting defendant's previous conduct and the stoppage of the work and concluding as follows:

"Under these circumstances and owing to your entire failure to comply with the terms of the contract, we hereby notify you that we now terminate the contract and shall proceed no further with the work, and that we shall hold you liable for damages we have sustained by reason of your breach of contract, including your failure to provide labor and materials not included in the contract with

us in such manner as not to delay the material progress of our work and your failure to make payments in accordance with the terms of the contract, and all other breaches of contract on your part."

Defendant acknowledged receipt and replied May 31, 1912: "Said letter is a breach of contract on your part, and we shall immediately proceed to have the work done by other parties, and shall charge you with the additional expense, if any, above your contract price."

Plaintiff further produced evidence tending to show that the moneys expended by it in and about the performance of the contract amounted to upwards of $30,000; that if permitted to complete the contract under ordinary conditions, its estimated profits would have been about $9,700; and that defendant had taken over machinery, tools, etc., belonging to plaintiff estimated to be worth from $3,300 to $3,800.

Defendant to some extent disputed the facts recounted in and inferable from plaintiff's evidence, but based its defense principally upon the provisions of the contract between defendant and the Government, which it was insisted must be read into the contract between plaintiff and defendant. Among those provisions was this:

"It is further covenanted and agreed that the United States shall have the right of suspending the whole or any part of the work herein contracted to be done, whenever in the opinion of the Supervising Architect it may be necessary for the purposes or advantage of the work, and upon such occasion or occasions the contractor shall, without expense to the United States, properly cover over, secure, and protect such of the work as may be liable to sustain injury from the weather, or otherwise; and for all such suspensions the contractor shall be allowed one day additional to the time herein stated for each and every day of such delay so caused in the completion of the work, the same to be ascertained by the

Supervising Architect; and a similar allowance of extra
time will be made for such other delays as the Supervising
Architect may find to have been caused by the United
States, provided that a written claim therefor is presented
by the contractor within ten days of the occurrence of
such delays; provided, further, that no claim shall be
made or allowed to the contractor for any damages which
may arise out of any delay caused by the United States."

And among the "General Conditions" prefacing the
specifications was this:

"The Department, acting for the United States, re-
serves the right to suspend any portion of the work em-
braced in the contract whenever, in its opinion, it would
be inexpedient to carry on said work."

Other contentions were made which are not now ma-
terial.

The jury rendered a verdict somewhat special in form,
finding for the plaintiff and assessing its damages at
$6,609.25, "including the value of tools inventoried at
$3,000." The judge had instructed them that for certain
material and appliances used by plaintiff in carrying out
its contract, and which were placed in the custody and
charge of defendant, "credit must be given, in whatever
decision you arrive at, to the plaintiff company, and in
the uncontradicted sum of $3,000." Just how the residue
of the verdict was made up we have no means of deter-
mining, nor is it now important.

The chief controversy here is over the admission in
evidence of the general contract, and the effect given to
it in the rulings of the trial judge, which were in substance
that the provisions of that contract, including those
above quoted, were to be read into the sub-contract,
and that for any delays which resulted from the action
of the representatives of the Government in changing
the foundations or plans of the building, in suspending
or stopping the work, or otherwise, defendant was not

responsible to plaintiff. To these rulings exceptions were duly taken.

From what was said by the trial judge it would seem that he labored under the impression that the Supervising Architect of the Treasury was a party to the sub-contract. This is not the case; he did not sign the agreement, and his name was inserted solely in the capacity of architect or referee. And although the sub-contract very plainly imports that it covers only a part of the work of constructing the building, and that the Carlin Company was the general contractor, it contains no clause incorporating into itself the provisions of the principal contract, or even in terms referring to that instrument. The sub-contractor's work was agreed to be done according to drawings and specifications, "copies of which have been delivered to the subcontractor." These copies were not produced, nor was their non-production accounted for. The parties seem to have assumed that the drawings and specifications of which copies were to have been delivered with the sub-contract were identical with those that formed a part of the general contract; and we adopt that assumption.

The reference in the sub-contract to the drawings and specifications was evidently for the mere purpose of indicating what work was to be done, and in what manner done, by the sub-contractor. Notwithstanding occasional expressions of a different view (see *Shaw* v. *First Baptist Church*, 44 Minnesota, 22, 24; *Avery* v. *Supervisors*, 71 Michigan, 538, 546, 547; *Stein* v. *McCarthy*, 120 Wisconsin, 288, 295), in our opinion the true rule, based upon sound reason and supported by the greater weight of authority, is that in the case of sub-contracts, as in other cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified. *Woodruff* v. *Hough*, 91 U. S.

596, 602; *Neuval* v. *Cowell*, 36 California, 648, 650; *Mannix* v. *Tryon*, 152 California, 31, 39; *Moreing* v. *Weber*, 3 Cal. App. 14, 20; *Short* v. *Van Dyke*, 50 Minnesota, 286, 289; *Noyes* v. *Butler Bros.*, 98 Minnesota, 448, 450; *Modern Steel Co.* v. *English Construction Co.*, 129 Wisconsin, 31, 40, 41.

In the present case, not only was the reference to the drawings and specifications for a limited purpose, but the sub-contract, by the express terms of its eleventh paragraph, placed upon the general contractor (defendant) the obligation to "provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work." Applying this to the facts of the case, defendant agreed to furnish the foundation in such manner that plaintiff might build upon it without delay. This is inconsistent with any implication that the parties intended that delays attributable to the action of the owner should leave plaintiff remediless.

We therefore hold that the general contract was not admissible in evidence against plaintiff, unless for the purpose of showing (if, indeed, it did show) what drawings and specifications were referred to in the sub-contract; and that the rulings of the trial judge holding plaintiff bound by the provisions of the general contract, so as to be obliged to submit to delays resulting from the action of the Government, were erroneous.

Another point that may conveniently be dealt with here is raised by an exception taken to the instruction that "even if there was delay in furnishing granite, there could have been no liability under the sub-contract for such delay, in money, but such a condition was to be remedied by an extension of time for completion, as therein provided." This was clearly erroneous. Paragraph 11 binds defendant to reimburse plaintiff for any loss caused by delay resulting from defendant's failure to provide materials not included in the sub-contract. The

granite was in this category. The trial court misapplied Paragraph 7. The extension of time therein provided for was intended as a dispensation, under given circumstances, of the liability to liquidated damages imposed upon the sub-contractor by Paragraph 6 for failure to complete his work within the time therein limited. The purpose of Paragraph 7 is to relieve the sub-contractor. It cannot properly be construed to deprive him of his right under Paragraph 11 to reimbursement for losses attributable to delays assumed by the general contractor. *Nelson* v. *Pickwick Associated Co.*, 30 Ill. App. 333.

What has been said indicates the disposition that must be made of another exception taken by plaintiff, which was to the instruction that under Paragraph 7 plaintiff was not entitled to recover damages or money compensation from defendant even though it should appear that plaintiff "was obstructed or delayed in the prosecution or completion of the work by the neglect, delay, or default of the Government of the United States, the Supervising Architect, or his representatives, or by defendant, or by alterations required in the work, since by the provisions of that paragraph the only remedy of plaintiff in such cases is the time allowance therein provided for; unless, however, you should believe from the evidence that the defendant failed to provide labor and materials not included in the sub-contract, in such manner as to delay the material progress of the work."

As we have shown, the failure to furnish a foundation upon which plaintiff's work could be superimposed was a failure to provide "labor and materials not included in this contract," within the meaning of paragraph 11. To furnish the foundation defendant assumed an obligation not conditioned by the question whether it was at fault or whether the delay was involuntary on its part because attributable to a stoppage of work by the owner in the exercise of a right conferred upon it by the principal con-

tract. Defendant of course had notice of the Government's right to suspend the work, and could easily have safeguarded itself against responsibility to the sub-contractor for delays attributable to the exercise of that right by an appropriate modification of Paragraph 11 of the sub-contract, for which presumably an allowance would have been made to the sub-contractor in the form of an increased price for its work or otherwise. This not having been done, Paragraph 11 must be enforced as it is written. It matters not whether plaintiff or its predecessor had notice of the provision of the general contract respecting suspension of the work, since that provision was not incorporated into the sub-contract. It must be presumed that delays attributable to action by the Government were among those intended to be safeguarded by Paragraph 11.

There was testimony as to the profits that plaintiff probably would have gained if the contract had been proceeded with in the ordinary manner. But this question was excluded from the consideration of the jury upon the ground that the profits were contingent and speculative. In this there was error. The testimony was from an experienced witness, and included an estimate of the total cost to plaintiff of the doing of the work called for in the sub-contract. This amounted to $53,012. The contract price was $64,750. The witness testified that a profit of $9,700 would have been made. Whether he intended to say $11,700 was for the jury to determine. No more definite or certain method of estimating the profits could well be adopted, than to deduct from the contract price the probable cost of furnishing the materials and doing the work. *Phila., Wil. & Balt. R. R.* v. *Howard*, 13 How. 307, 344; *Hinckley* v. *Pittsburgh Steel Co.*, 121 U. S. 264, 275; *Anvil Mining Co.* v. *Humble*, 153 U. S. 540, 549.

Error is assigned to the refusal of the trial judge to give the following instruction:

"If you find that the defendant failed to make payments as called for by the contract, on account of work done by the plaintiff in accordance with the terms of the contract, such failure constitutes a breach of the contract on the part of the defendant, and justified the plaintiff in stopping work under the contract, and entitles it to recovery from the defendant of such damages as may be proper on the evidence and under the instructions which the Court will give you in that regard."

The request was evidently based upon the doctrine illustrated in *Canal Co.* v. *Gordon*, 6 Wall. 561; *Phillips &c. Constr. Co.* v. *Seymour*, 91 U. S. 646, 649; *Norrington* v. *Wright*, 115 U. S. 188, 205. There is a difficulty, however, in applying that doctrine to this case, due to the fact that the contract does not either specify the amount of the advance payments or indicate how they are to be ascertained. The language of Paragraph 12 is that the contract price is to be paid "in monthly payments on account not to exceed in amount 85% of the cost of the work actually erected in the building, provided," etc. There is no clause, such as is frequently found in contracts of this character, that the amounts payable from time to time shall be ascertained and certified by the architect. The language cannot be construed to oblige the general contractor to pay precisely 85% of the cost of the work done; the use of the words "not to exceed" forbids this. The paragraph must receive a reasonable construction, and undoubtedly required the general contractor to make substantial payments monthly, fairly approximating but not exceeding 85% of the cost of the work. But the proviso requiring the sub-contractor to furnish to the general contractor a written requisition did not entitle the sub-contractor to be the sole judge of the amount it was entitled to receive. On the contrary, the provision that the requisition should be submitted "not less than twelve days before payment is required" evidently con-

templated that the general contractor was to be afforded an opportunity to verify the propriety of the demand made. But the evidence fails to show that the requisitions were based upon the cost of the work, or that any clear statement of such cost was submitted with them. As already pointed out, the parties endeavored to arrive at an agreement about unit prices, in order that these might be employed in making up the requisitions. Whether they did so agree the evidence left in dispute. If the agreement was made, it was at the interview of February 2, 1912. A letter is in evidence, written by plaintiff to defendant under date of February 6, saying: "In accordance with your instruction to Mr. Converse we have made our January requisition in the units and unit prices used by the Government engineer. . . . We inclose formal requisition for $9,012.50 due us under contract." But the requisition itself was not introduced. The next and last requisition appears to have been made under date March 9, 1912, and this stated "Amount of work completed to date, $18,237." But such details as were furnished do not seem to bear out this estimate. In the state of the record, we cannot say that there was error in the refusal of the requested instruction.

Error is assigned because of the refusal to instruct the jury as follows:

"In estimating the recovery to which the plaintiff is entitled, if you find he is entitled to recover, you should consider the reasonable expenditures incurred, the unavoidable losses incident to stoppage, the amount of work actually performed, the amount plaintiff was actually entitled to by reason of such work at the contract price, and the profits which plaintiff could have made if allowed to complete the work under the contract."

Had the requested application of these elements of damage been confined to the case of plaintiff being found entitled to recover upon the theory that the contract was

rightfully terminated by the notice of May 22, 1912, we assume it ought to have been granted. *United States v. Behan,* 110 U. S. 338; *Anvil Mining Co. v. Humble,* 153 U. S. 540, 551, 552; *Roehm v. Horst,* 178 U. S. 1, 21. But, as already pointed out, other grounds of action were declared upon: (a) defendant's failure to provide granite blocks prior to October 16, 1911; (b) its failure between that date and March 19, 1912, to provide necessary materials and carry on its part of the construction work; and (c) a *quantum meruit* for labor performed and materials furnished. In the event of plaintiff's recovery being based upon these grounds only, some of the elements indicated in the request would not be properly applicable. The form of the request was such that compliance with it might have misled the jury, and hence there was no error in refusing it.

Exceptions were taken to the refusal of certain other instructions requested by plaintiff with the object of basing a recovery of damages, including profits, upon the ground of plaintiff having been prevented by defendant's acts from performing its contract within the time specified or a reasonable extension thereof, or on the ground that defendant's refusal to make payments and other breaches of contract were so unreasonable and inexcusable as to indicate an inability or unwillingness on its part to carry out the contract or to amount to a refusal to perform it in the future, such as to justify plaintiff in stopping work. But these exceptions have not been fully argued, and the requests are perhaps wanting in accuracy; hence, we pass them without consideration.

*Judgment reversed, and the cause remanded for further proceedings in accordance with this opinion.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.