DÍAZ & MOREY, INC., demandante y recurrido, *v.* ENRIQUE BÁEZ, JUAN LUBE, ETC., y FIREMAN'S BOND & INDEMNITY COMPANY, demandados y recurrentes.

*Número:* 87 *Resuelto:* 26 de febrero de 1963

*D. Guerrero Noble,* abogado de los recurrentes; *A. Castro Fernández* y *F. Castro Amy,* abogados de la recurrida.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

A los recurrentes Enrique Báez y Juan Lube se les adjudicó por la Autoridad de Hogares de Puerto Rico la ejecu-

ción del proyecto "La Playa" en Arecibo, Puerto Rico, identificado con el número UR PR 5-5, por una licitación de $94,857.65. Luego los recurrentes subcontrataron con la recurrida Díaz & Morey, Inc., el trabajo eléctrico de dicho proyecto y a esos efectos las partes suscribieron una carta-contrato el 12 de agosto de 1955 en los siguientes términos:

"DIAZ & MOREY, INC.
Y ASOCIADOS

CONTRATISTAS ELÉCTRICOS
INGENIEROS

12 de agosto de 1955.

Sres. Báez & Lube
Ingenieros–Contratistas,
Hato Rey, Puerto Rico

Muy señores nuestros y amigos:

Confirmando nuestra conversación de hoy con su Sr. Enrique Báez, nos comprometemos a llevar a cabo el trabajo eléctrico del proyecto de la Autoridad de Hogares de P. R. en Arecibo, de acuerdo con nuestra cotización del 14 de julio de 1955, por la suma de $12,500, excluyendo todo el trabajo de hormigón que sea necesario.

Nuestro trabajo estará sujeto a los planos y especificaciones de la Autoridad de Hogares.

Las condiciones de pago serán las mismas establecidas en su contrato del proyecto con la Autoridad.

Muy atentamente,

DIAZ & MOREY, INC.
(Fdo.) M. MOREY
M. MOREY–TESORERO"

La recurrida recibió $10,000 bajo dicho subcontrato y, al negársele el balance de $2,500, radicó demanda contra los recurrentes y Fireman's Bond and Indemnity Co., firma que había prestado la fianza de pago en relación con el proyecto. Alegó que había terminado el trabajo eléctrico de conformidad con las especificaciones, que el mismo había sido aceptado por la referida Autoridad y por la Autoridad de las Fuentes Fluviales de Puerto Rico y solicitó que se condenase a los

recurrentes a pagarle los $2,500 que aún le adeudaban más $500 de honorarios de abogado. Los recurrentes invocaron como defensa que el subcontrato en cuestión exigía que la obra se realizase de acuerdo con los planos y especificaciones de la Autoridad de Hogares y que las condiciones de pago serían las mismas establecidas en el contrato principal; que la recurrida dejó de ejecutar obras por valor de $2,100, cantidad que la Autoridad previamente mencionada dedujo a los recurrentes y que, por otra parte, éstos ejecutaron obra por valor de $900 que correspondía a la recurrida realizar, lo que hace un total de $3,000; y en tal virtud, para el caso que se decidiese que el trabajo de la recurrida fué convenido en la suma de $12,500, los recurrentes reclamaron por vía de reconvención la referida cantidad de $3,000 y solicitaron se declarase sin lugar la demanda y con lugar la contrademanda, condenándose a la recurrida a pagar a los recurrentes, la suma de $500.

El Tribunal de Distrito, Sala de San Juan, en 31 de mayo de 1960 declaró sin lugar la demanda en este caso e impuso las costas y $150 de honorarios de abogado a la recurrida, negándose a disponer cosa alguna con respecto a la reclamación de $900 por la obra ejecutada por los recurrentes y que correspondía a la recurrida. El referido tribunal concluyó que las condiciones de pago en el contrato principal del proyecto "La Playa" eran a base de medida por unidad de trabajo realizado, o sea, que la liquidación final sería hecha tomándose como base la obra realmente ejecutada; que el subcontrato de 12 de agosto de 1955 obligaba a realizar el trabajo eléctrico del proyecto por la suma de $12,500, "... sujeto a *los planos y especificaciones de la Autoridad...*" y que "[l]as condiciones de pago ... *serían las mismas establecidas en su contrato del proyecto con la Autoridad*"; que las condiciones de pago entre los contratantes fueron las mismas que le impuso la Autoridad de Hogares a los recurrentes; que el testigo Osvaldo Hidalgo, ingeniero jefe

de dicha Autoridad, demostró que del estimado original de la parte eléctrica del proyecto hubo una reducción de obra a realizarse por la cantidad de $2,153.48 y que la recurrida realizó obra adicional no contemplada por el estimado original en la suma de $65; que la recurrida no demostró que había realizado obra por valor de $12,500; que las partes convinieron que su forma y condiciones de pago estaban basadas en la obra realmente ejecutada y que las partes quedaban sujetas y obligadas a la liquidación final que hiciese la referida Autoridad sin tomarse en consideración los anticipos parciales que en forma de adelanto, según disponen las especificaciones, recibieron tanto los recurrentes como la recurrida, citándose al efecto la Sec. 108 sobre pagos a los contratistas de las condiciones generales del contrato principal relativo al proyecto "La Playa" concertado entre los recurrentes y la Autoridad en cuestión.(1)

De esa sentencia apeló la recurrida ante el Tribunal Superior, Sala de San Juan, pero no lo hicieron los recurrentes del dictamen del Tribunal de Distrito negándose a disponer cosa alguna con respecto a la reclamación de ellos por trabajo realizado que correspondía a la recurrida. El Tribunal Superior, por sentencia de 11 de mayo de 1961, revocó la sentencia apelada y dictó otra condenando a los recurrentes a pagar a los recurridos la suma reclamada de $2,500, más las costas y la suma de $200 para honorarios de abogado.

---

(1) El texto en inglés de la Sec. 108 de las Condiciones Generales del referido contrato principal dice así:

"___ (a) .　　　.　　　.　　　.　　　.　　　.　　　.

___ (b) Monthly or partial payments made by the Local Public Agency to the Contrator are monies advanced for the purpose of assisting the Contractor to expedite the work of construction. All material and completed work covered by such monthly or partial payments shall remain the property of the Contractor and he shall be responsible for the care and protection of all materials and work upon which payments have been made. Such payments shall not constitute a waiver of the right of the Local Public Agency to require the fulfillment of all terms of the Contract and the delivery of all improvements embraced in this Contract complete and satisfactory to the Local Public Agency in all details."

Resolvió el referido tribunal que el Tribunal de Distrito cometió error al declarar sin lugar la demanda en este caso, conforme a la interpretación dada al subcontrato por los recurrentes, porque esa interpretación es a todas luces insostenible; que "[n]o puede haber duda que las partes convinieron una suma global, específica y determinada por el trabajo subcontratado. Dar al último párrafo del subcontrato la interpretación que pretenden los apelados y con la cual estuvo de acuerdo el Tribunal de Distrito significaría (1) desechar el precio expresamente convenido y (2) poner en el subcontrato, a guisa de interpretación, un precio distinto—el unitario del contrato original—que no pudo ser la intención de las partes convenir porque ambos se excluyen entre sí. No es posible descartar lo expresamente convenido para intercalar en el subcontrato lo que éste no dice: que a él le quedaban incorporados los precios por unidad del contrato con la Autoridad de Hogares. La única interpretación sensata que cabe dar al último párrafo del subcontrato es que la apelante recibiría los pagos por anticipos, con cargo al precio convenido, en la misma forma acordada por los apelados en su contrato con la Autoridad de Hogares."

La revocación de la sentencia del Tribunal de Distrito en este caso no obedece a que erró en sus determinaciones de hecho sino a que no interpretó correctamente las disposiciones de los dos contratos en juego en este caso.

La parte eléctrica del contrato principal con respecto al proyecto "La Playa" aparece relacionada en el pliego impreso de cotización que forma parte de dicho contrato. En este pliego la Autoridad indicó las distintas partidas de la obra, las cantidades estimadas de materiales y equipo y proveyó en dicho pliego unos blancos que los licitadores debían llenar con sus cotizaciones de los precios por cada unidad de equipo y de material, incluyendo mano de obra, materiales, fianzas, seguro, gastos generales y beneficio según el referido pliego de cotizaciones. La cotización de los recurrentes por el tra-

bajo eléctrico arrojaba un total de $14,673.50, a base de las cantidades estimadas de equipo y materiales. Después de la inspección final y aceptación de la obra, el inspector de la Autoridad midió la cantidad de cada partida de trabajo y preparó un estimado final a los precios unitarios cotizados y aceptados por la Autoridad. Como resultado, según la declaración del recurrente Enrique Báez y la liquidación final del proyecto admitida en evidencia, hubo cinco alteraciones en relación con su contrato eléctrico, o sea:

1) con respecto a la partida Núm. 38, la Autoridad estimó en su pliego de cotizaciones 3,000 pies lineales de alambre de cobre Núm. 2 WP, por lo que los recurrentes cotizaron a razón de 20¢ el pie. El cómputo final dio 1,440 pies lineales de manera que el precio de esta partida se redujo a $288, o sea que de la cotización de los recurrentes por esta partida, de $600, la Autoridad redujo $312.

2) con respecto a la partida Núm. 39, la Autoridad estimó en su pliego de cotizaciones 850 pies lineales de alambre Núm. 4 WP por lo que los recurrentes cotizaron a razón de 13¢ el pie. El cómputo final demostró que se utilizaron 1,350 pies, de manera que los recurrentes recibieron $175.50 bajo esta partida, o sea $65 en exceso de su cotización original de $110.50.

3) con respecto a la partida Núm. 40, la Autoridad estimó en su pliego de cotizaciones 7,800 pies lineales de alambre de cobre Núm. 4 HD, sin aislación, por lo que los recurrentes cotizaron a 12¢ el pie. El cómputo final demostró que sólo se utilizaron 786 pies, de manera que el precio de los recurrentes se redujo de $936 a $94.32, o sea, en la cantidad de $841.68.

4) con respecto a la partida Núm. 41, la Autoridad estimó en su pliego de cotizaciones 400 pies lineales de alambre Núm. 6 WP y los recurrentes cotizaron a razón de 13¢ el pie. En vista de que el cómputo final demostró que sólo se

usaron 192 pies, el precio de los recurrentes se redujo de $52 a $24.96, o sea, en la cantidad de $27.04.

5) Y, por último, con respecto a la partida Núm. 42, la Autoridad estimó en su pliego de cotizaciones 5,300 pies lineales de cable Núm. 6 DB y los recurrentes cotizaron por esta partida a razón de 83¢ el pie. Pero, como el cómputo final reveló que sólo se utilizaron 4,128 pies, la cotización de los recurrentes se redujo de $4,399 a $3,426.24, o sea en $972.76.

El total de estas reducciones asciende a $2,153.48 del cual deben restarse los $65 pagados por aumento bajo la partida Núm. 39, de manera que la cantidad neta reducida del precio total cotizado por los recurrentes que asciende a $14,673.50 por todas las partidas eléctricas, es la suma de $2,088.48. Admitido por las partes que la recurrida ejecutó la obra a satisfacción de la referida Autoridad y que fue aceptada por ésta, es forzoso concluir, de un mero cálculo aritmético basado en los datos admitidos en evidencia que los recurrentes han recibido o tienen derecho a recibir como precio final por las partidas de obra eléctrica, la cantidad neta de $12,885.02. Es aparente, además, que la reducción en las partidas a que nos hemos referido no se debe a cambios exigidos por la Autoridad que resultaron en la realización de menos obra sino que la Autoridad sobrestimó el requisito de materiales en las partidas Núms. 38, 40, 41 y 42 y estimó de menos en la partida 39, de manera que bajo el sistema de precio por unidad convenido en el contrato principal, la Autoridad logró la obra especificada por un costo menor y a un precio más bajo desde el punto de vista de los recurrentes.

Ahora bien, ¿cómo pueden afectar estos cómputos finales la cotización de $12,500 de la recurrida que realizó la referida obra eléctrica bajo su subcontrato de 12 de agosto de 1955?

La carta–subcontrato de 12 de agosto de 1955 dispone que *"Nuestro trabajo estará sujeto a los planos y especifica-*

*ciones de la Autoridad de Hogares"* y que *"Las condiciones de pago serán las mismas establecidas en su contrato del proyecto con la Autoridad."* (Énfasis nuestro.)

 Es práctica generalizada el subcontratar distintas partes de contratos de construcción relacionados con proyectos como el que nos ocupa. Usualmente, estos subcontratos hacen referencia a los planos y especificaciones del contrato principal en el sentido que el trabajo subcontratado se ajustará a los mismos. Se ha sostenido reiteradamente que cuando se hace referencia en un contrato de construcción a un documento extraño, éste queda incorporado únicamente para el propósito específico para el cual se menciona. *Guerini Stone Co.* v. *P. J. Carlin Construction Co.,* 240 U.S. 264 (1916). Véase Corbin, *Contracts,* ed. 1960, sec. 549. Los planos y las especificaciones indudablemente indican la naturaleza de la obra y la forma y manera de realizarla y nada tienen que ver con ni pueden afectar de por sí el precio cotizado. *Edward E. Morgan Co.* v. *U. S.,* 230 F.2d 896 (C.A. 5, 1956); *Arrow Sheet Metal Works* v. *Bryant & Detwiler Co.,* 61 N.W.2d 125 (Mich. 1953); *Moses* v. *Edward H. Ellis, Inc.,* 72 A.2d 856 (N.J. 1950); *Noyes* v. *Butler Bros.,* 108 N.W. 839 (Minn. 1906). Las condiciones de pago sólo pueden referirse a la forma y manera de realizar anticipos de pagos parciales, pues no se convino en el subcontrato un precio por unidad sino, por el contrario, un precio alzado por toda la obra, de manera que el precio cotizado por el contratista en este caso no podía quedar sujeto a ajustes sobre la base del cómputo final provisto por el contrato principal.

En la negociación del subcontrato, los recurrentes, que ya habían asumido la obligación a base de precio por unidad, no aclararon la situación como pudieron haberlo hecho, presumiblemente porque el precio alzado de $12,500 del subcontrato era menor que el de $14,673.50 cotizado por los recurrentes por la obra eléctrica, a base de sus precios por uni-

dad, de manera que éstos estaban en condiciones de presumir que siendo los estimados de la Autoridad conservadores, habrían de lograr una ganancia sustancial en la subcontratación de la parte eléctrica de la obra. La recurrida, por otra parte, que por su conocimiento de las condiciones de pago sabía que el precio cotizado por los recurrentes era por unidad prefirió cotizar un precio alzado porque indudablemente se lo permitía el estimado que hiciera de sus posibles costos para realizar la obra.

Con el fin de sostener que el precio del subcontrato está condicionado al precio por unidad del contrato principal los recurrentes especulan sobre la posición que hubiera asumido la recurrida si la Autoridad hubiera aumentado la cantidad de obra a ejecutarse —esto presume que la cantidad de obra se rebajó en realidad— y concluyen que en caso de tal aumento la posición de la recurrida sería distinta de la que ha asumido ahora, de modo que en vez de estar reclamando un precio alzado como lo hace en la situación del caso de autos, estaría reclamando que el precio del subcontrato es en realidad por unidad. Este argumento carece de méritos porque parte de una base errónea. En el caso de autos la Autoridad no redujo la cantidad de obra a ejecutarse. Lo que ocurrió fue que para la realización del trabajo eléctrico especifica·lo por la Autoridad se usó menos material del estimado por ella y como el precio cotizado en el contrato principal era por unidad, la Autoridad podía reajustarlo. Si la cantidad de material utilizada para realizar la obra especificada hubiera excedido los estimados de la Autoridad, entonces el precio calculado por unidad hubiese excedido el cotizado en el contrato principal, pero los recurrentes no hubiesen podido cobrar el aumento que no excediese del 25% del precio original del contrato, por disposición expresa del párrafo 9 de las Instrucciones a los Licitadores que forma parte del contrato

principal.(²) Como el precio del subcontrato era un precio alzado por la realización de la obra especificada, entonces la recurrida no tenía derecho alguno de reclamarle a los recurrentes el precio adicional resultante.(³) Por el contrario, la Autoridad tenía facultad para hacer cambios en la obra mediante revisiones en los planos, con el fin de proveer adiciones u omitir obra. Si esto hubiere ocurrido, tanto el precio total de los recurrentes como el de la recurrida hubiera quedado sujeto a reajuste mediante negociación(⁴) entre las

---

(²) El párrafo 9 de las Instrucciones a Licitadores dice así en su texto inglés:

"The Unit prices for each of the several items in the Proposal of each Bidder shall include its prorata part of overhead on profit and be such that the whole of the unit prices will represent a balanced Bid. Any Bid not conforming to this requirement may be rejected as informal. The special attention of all Bidders is called to this provision, for should conditions make it necessary to revise the quantities, no limit will be fixed for such increased or decreased quantities nor extra compensation allowed, provided the net monetary values of all such additive and substractive changes in quantities of such items of work (i.e., difference in cost) shall not decrease the original contract price by more than twenty-five (25) percent, except for work not covered in the Working Drawings and Technical Specifications as provided in the Section 109—CHANGES IN THE WORK under GENERAL CONDITIONS, PART 1."

(³) El comentarista Manresa en el tomo X, pág. 924 de su obra sobre el Código Civil Español, al analizar el Art. 1593 equivalente al Art. 1485 del Código Civil de Puerto Rico—31 L.P.R.A. sec. 4126, se expresa en la siguiente forma: "Precisamente uno de los caracteres que van implícitos en el contrato de arrendamiento de obras por ajuste o precio alzado es el de ser aleatorio, pues algo de contingente hay siempre en la cuantía de las utilidades que el contratista se propone obtener. Ya en el período de generación del contrato se tiene en cuenta esta su especial naturaleza, pues no puede ocultarse que entre el plano o proyecto y el presupuesto y la realidad de la ejecución de la obra no existe siempre la más exacta correspondencia."

(⁴) El Art. 1485 del Código Civil en su parte final dice que el contratista por precio alzado podrá pedir aumento de precio "cuando se haya hecho algún cambio en el plano que produzca aumento de obra, siempre que hubiese dado su autorización el propietario." Manresa, *ob cit.*, a la página 925 comenta sobre este precepto: "Este aumento de precio no procede de la naturaleza del contrato, sino de la verdadera novación que las partes han introducido en él, de su propia voluntad concordada, pues ya vemos que el Código exige el requisito indispensable de que el propietario haya dado su autorización, la cual, en concurrencia con la propuesta del

partes bien sobre la base de precio alzado o a base de "costo-más-cantidad adicional limitada" (cost-plus-limited basis). Así lo dispone específicamente la Sec. 109 de las Condiciones Generales del referido contrato principal. Cfr. *Farber Electric* v. *Professional Realty Corp.*, 85 D.P.R. 459, (1962). Pero el récord demuestra que la Autoridad no requirió tales adiciones ni dispuso reducciones en la obra a realizarse. Por consiguiente, debemos forzosamente concluir que la reducción de $2,153.48 en el precio de la obra se debió únicamente a que el cómputo final demostró el uso de una cantidad de materiales menor que la estimada en relación con la ejecución de la obra total especificada. No tiene mérito por proceder igualmente de una base errónea, el alegar que, de ser correcta la posición de la recurrida de que se convino un precio alzado bajo el subcontrato, si la Autoridad reducía la obra en $2,500 la recurrida se beneficiaba en esa cantidad y si la aumentaba en tal suma los recurrentes se beneficiaban de la misma. El resultado al aplicarse la referida Sec. 109 hubiera sido muy distinto, como hemos demostrado, y hubiera impedido una situación como la alegada.

Se arguye que si la cotización del subcontrato era por un precio alzado, la recurrida se hubiera negado a realizar la obra adicional que por valor de $65 llevó a cabo bajo la partida Núm. 39 previamente relacionada. También carece de méritos este argumento, pues bajo la partida Núm. 39 no se realizó obra adicional alguna ya que el récord demuestra que la Autoridad no emitió órdenes de cambios ni revisión de planos ni negoció el precio correspondiente al cambio como provee la referida Sec. 109 de las Condiciones Generales del contrato principal. Contrario al caso de las otras partidas reajustadas, en ésta el cómputo final demostró que se

---

arquitecto o contratista, no es otra cosa que una fórmula de consentimiento." A pesar de que lo anterior trata sobre la relación entre contratista por precio alzado y propietario, las mismas normas rigen la relación entre subcontratista por precio alzado y aquél que le subcontrató determinada obra.

usó más material y por tal razón la Autoridad reajustó el precio de la partida concediendo a los recurrentes un aumento de $65 en dicho precio el cual los recurrentes podían retener y la recurrida no podía reclamar bajo su subcontrato. Se trataba de la utilización de material adicional al estimado original para realizar la misma obra especificada y no de una exigencia de la Autoridad bajo la referida Sec. 109. Por lo tanto, la recurrida no tenía reclamación alguna que hacer ni podía negarse a realizar obra adicional bajo dicha partida.

Además, existe otra razón demostrativa de que el precio unitario del contrato original no podía obligar a la recurrida. Nótese que el precio total cotizado por los recurrentes, calculado a base de sus cotizaciones por unidad y los estimados indicados por la Autoridad en su pliego de subasta, ascendía a $14,673.50, mientras que el precio del subcontrato por la misma obra era $12,500. Necesariamente, por lo tanto, de haber precios unitarios en el subcontrato hubieran tenido que ser menores que los del contrato principal. Luego, al ocurrir el reajuste en precio en las partidas Núms. 38, 39, 40, 41 y 42, éste se lleva a cabo de acuerdo con los precios unitarios cotizados por los recurrentes para totalizar $14,673.50 como precio de la parte eléctrica del proyecto. Pretenden entonces los recurrentes que la recurrida cargue con la totalidad de tal reajuste cuando equitativamente no debería corresponderle más que la parte proporcional atrabuible a su cotización de $12,500. Obviamente esto último no es posible, pues no se puede justificar bajo ninguna estipulación del subcontrato ni existe precio unitario alguno estipulado bajo el subcontrato ni que sea aplicable en justa proporción a la cotización de la recurrida. No es una interpretación justa y realista de las relaciones contractuales de las partes en este litigio aquélla que permite deducir de una cotización más baja, un reajuste calculado a base de los precios unitarios de una cotización más alta en ausencia de convenio expreso al efecto.

A la luz del análisis precedente, concluimos que la recurrida cotizó un precio alzado en su subcontrato y en tal virtud los reajustes de precio de acuerdo con el cómputo final de la obra eran por riesgo exclusivo de los recurrentes.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 11 de mayo de 1961.*

