# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-3967

ROGER L. FIX,

*Plaintiff-Appellee,*

v.

QUANTUM INDUSTRIAL PARTNERS LDC,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 0328—**Amy J. St. Eve**, *Judge.*

_____

ARGUED MAY 24, 2004—DECIDED JULY 6, 2004

_____

Before RIPPLE, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* As his name implies, Roger Fix had the reputation of a man who could fix things. In this case, Outboard Marine Corporation (OMC) (of which the defendant Quantum was controlling investor) hired Fix in an effort to save its fledgling business. Fix could not, however, turn the company around. Shortly after Fix began, Quantum discontinued its investment, and OMC declared bankruptcy. After its assets were sold, OMC fired Fix. In response, Fix filed suit in the Northern District of Illinois seeking payment under a clause in his employment agreement which requires Quantum to pay him $5 million in the

event of a "Change in Control of the Company." Quantum refused, contending that the sale in connection with a bankruptcy does not trigger the clause. The district court granted Fix summary judgment, 2003 WL 21439982 (N.D. Ill. June 18, 2003), and Quantum appeals.

OMC is a manufacturer of boats and boat engines. Quantum, a private equity fund managed by Soros Private Equity Partners, L.L.C., owned a controlling interest in OMC. At the beginning of 2000, Quantum had invested over $200 million in OMC. By May 2000, the company had pumped an additional $85 million into OMC. *See* Gregory Zuckerman, *Capsizing of Outboard Marine Shows How Soros Took a Bath in Private Equity*, Wall St. J., Jan 12, 2001, at C1. Nevertheless, OMC continued to lose hundreds of millions of dollars.

Beginning in February 2000, OMC recruited Fix to try to save the company. Fix was chief executive of John Crane Inc., where he had been since 1996 and where he had pension benefits, stock options, long-term deferred compensation benefits, and long-term security. In March or April, Frank Sica, a Quantum representative and a member of OMC's board of directors, met with Fix to discuss potential employment. Over the next several months, OMC, Fix, Quantum, and their lawyers[1] negotiated details of an employment agreement. On May 26, 2000, OMC, Quantum, and Fix finalized and executed the agreement. Fix began work as the company's chief operating officer in June 2000; about 2 months later he gained the title of chief executive officer.

---

[1] Matkov Salzman Madoff & Gunn represented Fix. OMC was represented by its general counsel and by attorneys from the law firm of Kirkland & Ellis. Quantum was represented by its corporate counsel.

Relevant to this appeal, Fix's employment agreement requires OMC to make certain financial payments to him in the event of a "Change in Control of the Company." Section 7(b) provides:

Upon the occurrence of a "Change in Control" (as defined under PROP [The Personal Rewards and Opportunities Program], but also including any sale to a person who is not otherwise an affiliate of the Company of more than 50% of the property, assets or business of the Company and its subsidiaries and affiliates, taken as a whole) (i) all Fix Options which have not theretofore vested shall immediately vest and (ii) the Company will make a cash payment (the "Make-up Payment") to Employee in an amount equal to the positive difference, if any, of (A) $5 million, less (B) the "Exercise Value of the Fix Options."

As the above provision states, the clause incorporates the "Change in Control" definition under PROP. PROP states:

[A] "Change in Control of the Company" occurs if:

(3) the Board of Directors approves the sale of all or substantially all of the property or assets of the Company;

* * * *

provided, however, that (i) a Change in Control of the Company shall not include an initial public offering of the Company and (ii) the occurrence of any specific event as described in this paragraph shall not constitute a Change in Control of the Company if during the 30-day period immediately preceding the date of the Change in Control of the Company the Board of Directors, by a majority vote, deems that the occurrence of such specific event does not constitute a Change in Control of the Company.

Finally, as part of the agreement, Quantum guaranteed the payment of Fix's salary, bonuses, and benefits, including any payments in the event of a "Change in Control."

Quantum decided, in November 2000, not to provide any further financial support to OMC. As a result, it became almost impossible for the company to turn around. Thus, in December 2000, the board of directors approved the "sale of all or substantially all of the assets of [OMC]." That approval expressly included the approval of a sale in or outside of bankruptcy. The board of directors did not, however, pass a resolution indicating that its approval of the sale would not constitute a "Change in Control."

On December 22, 2000, OMC filed for Chapter 11 bankruptcy in the bankruptcy court for the Northern District of Illinois. Before and after the filing, Fix worked to sell substantially all of the assets of OMC as approved and directed by the board of directors. By February 5, 2001, he negotiated the sale of substantially all assets for approximately $90 million, which the bankruptcy court approved on February 9, 2001. One week later, on February 16, the board of directors fired him.

Fix requested that Quantum pay his severance, vacation pay, and "Change in Control" payment pursuant to the guarantee under the employment agreement. Quantum refused and this litigation followed.[2] We review the district court's grant of summary judgment for Fix *de novo*. This is a diversity case, and because the agreement contains a Delaware choice-of-law provision, we apply Delaware law.

This case turns on the interpretation of the "Change in Control" definitions in the employment agreement. Initially,

---

[2] Prior to the district court's summary judgment decision, Quantum agreed to pay the vacation and severance pay to Fix. As for the $5 million, if the payment obligation is triggered, Quantum does not dispute the amount owed.

we must ask whether the language of the contract is clear and unambiguous. If it is, Delaware law dictates that we may not look to extrinsic evidence to interpret the contract. *See, e.g., O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 289 (Del. 2001) ("Delaware courts are obligated to confine themselves to the language of the document and not to look to extrinsic evidence to find ambiguity."); *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997) ("Extrinsic evidence is not used to interpret contract language where that language is 'plain and clear on its face.'"); *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992) ("It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract.").

Reviewing the employment agreement, we agree with the district court that the "Change in Control" language is clear and unambiguous. The agreement states that a "Change in Control" occurs if "the Board of Directors approves the sale of all or substantially all of the assets of [OMC]." That occurred in December 2000. The agreement also declares that a "Change in Control" payment is triggered after "any sale" of more than 50 percent of the assets of OMC. That occurred on February 9, 2001, when the bankruptcy court approved the sale of assets. Contrary to Quantum's argument, the language of the contract is not susceptible to different interpretations. Moreover, the language contains no exclusion or limitation that might exclude a sale of assets in connection with bankruptcy liquidation. Absent such a limitation, we will not read one into Fix's employment agreement. *See Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.").

In making this conclusion, we emphasize that the parties, which were all represented by accomplished legal counsel,

easily could have included specific language excluding any sale of assets in connection with bankruptcy from the definition of a "Change in Control" (indeed, it is somewhat remarkable that before the agreement was executed neither party considered the issue, considering that Fix was brought in specifically to save a sinking ship). Moreover, when the parties wanted to limit the definition of "Change in Control," they certainly knew how to do so. Indeed, the PROP definition for "Change in Control" includes an exclusion for an initial public offering and for any event that the board of directors deems does not constitute a "Change of Control." There is a strong presumption against reading into contracts provisions that easily could have been included but were not. Courts will not, absent circumstances not present here, insert a contract term when the agreement itself is silent. *See In re Marriage of Sweders*, 695 N.E.2d 526, 529 (Ill. App. Ct. 1998) ("A strong presumption exists against provisions that could easily have been included in the agreement but were not."), and *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 141 (Del. Ch. 2003) ("If the parties had agreed that the defendants should warrant the unaudited financials statements through November 30, 2000, . . . they could easily have done so. They did not.").

Nevertheless, Quantum argues that the agreement is ambiguous. First, it contends that the definition of "Change in Control" incorporates the purpose and intent of PROP—which is to create an incentive to build value in OMC.[3] By incorporating this purpose into the definition of "Change and Control," Quantum argues, Fix is entitled to payment only if the company grows and succeeds.

---

[3] PROP specifically states that it is an "exciting, new partnership between the Company's key employees and shareholders to ambitiously and dramatically grow and develop the value of the underlying businesses of the Company, and to mutually share in the success of those efforts."

The "Change in Control" provision, however, expressly incorporates *only* the PROP definition of "Change in Control." It does not incorporate the alleged purpose and intent. And we will not read such an incorporation into the contract. As the Supreme Court has noted, "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277 (1916). *See also State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. Ct. 1951) ("[A]n agreement will not be deemed to incorporate matter in some other instrument or writing except to the extent that the same is specifically set forth or identified by reference."); 11 *Williston on Contracts* § 30.25, p. 238 (4th ed. 2003) ("[I]t is important to note that where incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and should be treated as irrelevant for all other purposes."). Finally, although the language of the agreement is clear and we therefore do not examine extrinsic evidence, we note that OMC's general counsel, who drafted, negotiated, and finalized the employment agreement, admitted that OMC did not intend to incorporate PROP's purpose into the "Change in Control" provision.

Next, Quantum argues that the definitions for a "Change in Control" does not include a sale in bankruptcy because the formula for determining the amount of the "Change in Control" payment assumes that the OMC stock have value. This argument ignores the plain language of the agreement. Fix is entitled to the immediate vesting of all his stock options and the difference, "*if any*," of $5 million less the "Exercise Value of the Fix Options." If the exercise value of Fix's options is zero, as here, Fix is entitled to $5 million.

Because the language of the employment agreement is clear and unambiguous, there is no need for us to examine

any extrinsic evidence. Finally, we have considered Quantum's remaining arguments and deem them without merit.

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*