**CARIBE CONTRACTING CO., INC., Plaintiff**

v.

**MARY EDWARDS, Defendant**

Civil No. 1247/80

Territorial Court of the Virgin Islands

Div. of St. Croix at Christiansted

May 31, 1982

JOEL H. HOLT, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

JEAN-ROBERT ALFRED, ESQ., Christiansted, St. Croix, V.I., *for defendant*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

### I. FACTS

This case presents a controversy between an owner of land and a building contractor arising out of an alleged breach of a construction contract.

The parties entered into a written contract "to construct a prefabricated house . . ." supplemented by "plans [and specifications] as prepared by [plaintiff] . . . ."[1] Execution of this contract occurred after an original draft had been modified to incorporate a schedule of payments which had been modified by the bank providing the construction financing for the defendant. The bank is not a party to this action. In all other respects, the contract remained essentially unchanged and, I find, unambiguous. At a time when the building was approximately 89%[2] complete the parties fell into disagreement and the stage was set for this dispute.

Two separate and distinct claims are asserted by plaintiff. The first seeks payment of the unpaid portion of the contract price and the second seeks recovery for certain extras allegedly performed by plaintiff at the behest of defendant. These claims will be addressed individually.

### II. ADDITIONAL WORK

Plaintiff asserts a claim for each of the following items of work allegedly not covered by the contract.[3]

| | |
|---|---|
| Site preparation | $1,250.00 |
| Extra block to elevate house | 316.00 |
| Extra window | 110.00 |
| Porch railing[4] | 416.75 |

---

[1] Plaintiff's Exhibit 1.

[2] Testimony of Robert Cobb bank appraiser.

[3] Plaintiff's Exhibit 4. The additional claim for $60.00 for water used on the job has been waived.

[4] The testimony discloses that this was actually an enclosure of the area under the porch rather than a railing.

| | |
|---|---|
| Additional outside concrete work | 130.00 |
| Difference for ceramic tile plus soap dishes | 207.25 |
| Drainage field | 320.00 |
| TOTAL | $2,859.00 |

Defendant resists payment for the site preparation and drainage field, asserting that both these items were covered by the contract price and did not constitute extras. She does not seriously dispute any of the remaining claims for extras.

## A. Site Preparation

The contract to build the house states that "[a]ny unusual site problems which will cause additional cost will be added to the price quoted." The evidence adduced at trial revealed no "unusual" problems which would require the Court to invoke this contract provision and allow additional compensation for the work done to the site. Plaintiff testified that the land had to be cleared and the brush, trees and boulders removed. Additionally, a hill had to be leveled. None of these items, however, constituted an impediment to the clearing which could be considered out of the ordinary. The contract contemplated situations whereby some feature of the land made site preparation for a prefabricated house more difficult and thereby more expensive than one would normally anticipate. Had the land been a rock bed, or an area having poor lateral support, the additional charges might be warranted. Here, they are not.

## B. Drainage Field

Plaintiff contends that defendant is required to pay for the additional work done to the drainage/leaching field. The specifications set forth on the building plans[5] under #13 provide for the installation of all plumbing and the plans show the septic tank details and seepage pit locations. Accordingly, there is no question that this work was contemplated under the contract. Levinson testified, however, that the defendant did not want the system shown on the plans, but was insistent that a leaching field be installed. Norman Williams, an official of the Department of Public Works, a disinterested witness, testified that when he inspected the house and septic tank he found the tank to be correct according to departmental regulations, but the pit too close to the tank. Because plaintiff obligated himself to install the pit, and did it incorrectly, he was required to

[5] Plaintiff's Exhibit 2.

move the pit at his own expense. The increased cost of doing this work cannot be passed on to the defendant. The $320.00 claimed for the drainage field will not be allowed.

### III. ANTICIPATORY BREACH

A more complex problem arises in determining what damages, if any, are appropriate for the breach of contract. Plaintiff has requested, by way of his complaint, $10,359.00, such sum representing the balance due on the contract. The original contract price was $37,200.00,[6] payable in installments, each installment due upon completion of a percentage of the work, as certified by an appraiser from the bank securing the financing. The first four payments totalling $29,760.00, were made as scheduled, the last on or about July 29, 1980. The balance then remaining on the contract was $7,440.00. The construction project was approximately 89% complete at this moment. On August 14, 1980, defendant sent Levinson a letter stating "Please be advised that I do not intend to make any more payments on the house until the following items are completed to my satisfaction . . . ." (Plaintiff's Exhibit #3.) The first and second items listed deal with the manner and color of the painting job. The third item details a request for compensation for a shade tree which was removed during site preparation. Plaintiff replied to this by letter dated August 25, 1980. (Plaintiff's Exhibit #4.) At this point in time, plaintiff ceased any additional work on the house. Defendant then retained another contractor to complete the unperformed portion of the contract.

■■ It is basic to our consideration that a valid, binding contract existed between the parties. In order to give rise to a claim for damages, a breach must have occurred. Since the statements of defendant contained in her letter of August 14, were prospective in nature, i.e., they related to her disinclination to pay for work which was either underway or about to be commenced, she may be said to have anticipatorily breached the contract. "If the promisor makes a definite statement to the promisee that he either will not or cannot perform his contract, this is a repudiation and will operate as an anticipatory breach unless the promisor had some justifying cause

---

[6] Since we have considered the claim for extras separately, the Court will confine its discussion herein to the contract price as stated.

for his statement." 4 CORBIN ON CONTRACTS § 959 at 856 (1951).[7]

■ The defects of which defendant complained in her letter are not significant when the entire contract is considered as a whole. The variances, if extant at all, were either not material or readily curable. The plaintiff had "substantially performed" the 89% of the contract under the terms as agreed. See RESTATEMENT (SECOND) OF CONTRACTS § 237, comment d; § 241.[8] Mary Edwards simply lacked sufficient cause to stop making the payments and did so at her own risk.

■ "Every breach gives rise to a claim for damages." RE-STATEMENT (SECOND) OF CONTRACTS § 236, comment a. The measure of damages for breach of contract is normally that amount which would put the plaintiff in the same position in which he would have been had the contract been performed. Dialist Co. v. Pulford, 399 A.2d 1374, 1379 (Md. Ct. Spec. App. 1979), citing to, United States v. Behan, 110 U.S. 338 (1884).[9] In a case involving breach of a construction contract the proper formula for apportioning damages is the contract price, less the cost of labor and materials for the incompleted portion of the construction. See Guerini Stone Co. v. P. J. Carlin Const. Co., 240 U.S. 264, 280 (1916).[10] The figure thus produced would represent the lost profit.[11] Since the

---

[7] The RESTATEMENT (SECOND) OF CONTRACTS defines anticipatory repudiation thus:
> (a) a statement by the obligor to the obligee that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or
> (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.
> Id. at § 250.

[8] These two sections interrelate in that § 237 defines the duty a party owes when the other party fails to render performance, and § 241 lists those circumstances which will be considered in determining whether a failure is material. The case of Jacobs & Young, Inc. v. Kent, 129 N.E. 889 (N.Y. 1921) illustrates the point that not every breach is material.

[9] Where any portion of the contract has been performed, recovery may be founded upon the contract price, or quantum meruit. See 13 Am.Jur.2d, Building and Construction Contracts § 78 at 78 (1964 & Supp. 1981).

[10] Recovery may not exceed the contract price. Murray v. Americare-Medical Designs, Inc., 181 S.E.2d 871, 873 (Fla. Ct. App. 1971).

[11] This type of profit is known as "direct" as opposed to "collateral" profit. Direct profits arise where the injured party is a seller or provider of goods and the defendant has breached the contract to buy. Damages are calculated according to the method of Guerini Stone, supra. Collateral profits stem from the buyer being

"defendant's non-performance . . . saves the plaintiff from the labor or expense of wholly or partly performing on his own part . . . the court deducts this saving made by the plaintiff from the value of the performance which the defendant should have made." 11 WILLISTON ON CONTRACTS § 1339 at 205 (3d ed. 1968).

■ Recovery for lost profits is predicated upon an affirmative finding for each part of a three prong test which has evolved from the case law on the subject. First, the breach of defendant must have caused the loss to plaintiff, M & R Contractors & Builders, Inc. v. Michael, 138 A.2d 350, 353 (Md. 1958); second, the damages must have been foreseeable by defendant at the time the contract was made, George v. George F. Berkander, Inc., 169 A.2d 370, 372 (R.I. 1961); and, third, lost profits must be shown with "reasonable certainty," Crankshaw v. Stanley Homes, Inc., 207 S.E.2d 241, 243 (Ga. Ct. App. 1974).

■ The first two prongs of the test present the Court with no difficulty in this case. The breach of defendant was certainly the direct cause of any lost profits by plaintiff. Foreseeability may be presumed here, since "a defendant bargaining with a businessman should necessarily foresee that the prospect of the *seller* making a profit was the reason he entered into the contract." M & R Contractors, supra at 354.[12]

■ The "certainty" test has been modified to a more flexible standard of "reasonable certainty." "In such instances recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty." M & R Contractors, supra at 355 (footnotes omitted). This is the

---

the injured party, and his intention to resell the goods. The loss of profit there is said to be collateral to the primary contract. See M & R Contractors & Builders v. Michael, 138 A.2d 350, 353–54 (Md. 1958). The relevance of this dichotomy is the degree necessary to sustain one's burden of proof. Where the claim is for collateral profits the proof, of necessity, must be more stringent. See John D. Copanos & Sons v. McDade Rigging, 403 A.2d 402, 405–06 (Md. Ct. Sp. App. 1979). See 5 CORBIN ON CONTRACTS § 1022 at 136 (1964), see also RESTATEMENT OF CONTRACTS (SECOND) § 352, comment b. Defining the terms as direct and collateral would apparently satisfy the objection raised by Professor Corbin regarding classification of profits as "certain" or "speculative." 5 CORBIN, supra at 139.

[12] This requirement is from the rule of the leading case, Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854). It has been adopted by the courts in the United States. See M & R Contractors, supra, at 353 and George Berkander, Inc., supra at 372. See also, 5 CORBIN ON CONTRACTS § 1007 (1951).

position taken in the RESTATEMENT OF CONTRACTS § 331[13] and carried through to the RESTATEMENT (SECOND) OF CONTRACTS § 352.[14] As the Washington Court of Appeals stated it:

> While uncertainty as to *fact* of damage is fatal to recovery, uncertainty as to *amount* will not result in a denial of recovery. (Citations omitted.) Where, because of the nature of the damage suffered, precise measurement is not possible, the trial judge must exercise sound discretion.

Huzzy v. Cuthbert Const. Co., 489 P.2d 749, 752 (Wash. App. 1971) (emphasis in original), see 25 C.J.S. Damages § 43 at 747–748 (1966).

The degree of certainty varies with the facts of each case.[15] In Crankshaw v. Stanley Homes, Inc., 207 S.E.2d 241, 243 (Ga. Ct. App. 1974) plaintiff was prevented from completing a drywall construction at defendant's apartment building, and appealed from an adverse ruling by the trial court on the question of proof of damages. Plaintiff had testified as to the cost of labor and material for the remaining portion of the work as well as to the method utilized in arriving at the figure. The trial judge found the evidence wanting and granted defendant's motion for a directed verdict. The Court of Appeals reversed holding:

> We do not view this testimony as so uncertain as to warrant the direction of a verdict in defendant's favor. Though there should not be reliance upon speculation and conjecture and the proof should be made with all possible specificity, it has been held in countless cases that reasonable certainty is all that is required.

---

[13] RESTATEMENT OF CONTRACTS § 331:

> (1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

[14] RESTATEMENT (SECOND) OF CONTRACTS § 352:

> Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

[15] See, e.g., Peter Kiewit Sons' Co. v. Summit Const. Co., 422 F.2d 242, 261 (8th Cir. 1979) (applying South Dakota test of reasonable certainty); Frank Sullivan Co. v. Midwest Sheet Metal Works, 335 F.2d 33, 41–42 (8th Cir. 1964) (applying Minnesota rule of reasonable certainty and finding plaintiff's testimony, even with statements of uncertainty and "guesstimates", sufficient); Lee Shops, Inc. v. Schatten-Cypress Co., 350 F.2d 12, 18 (6th Cir. 1965), citing to the rule in Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555 (1931). Story Parchment, although applying the rule stated here, is analogous support only, since it deals with damages for a tort action.

Id. at 243. See generally 5 CORBIN ON CONTRACTS § 1094 (1951 & Supp. 1980); 11 WILLISTON ON CONTRACTS § 1363 (3d ed. 1968).

## CONCLUSION

We turn to the evidence adduced at trial in order to determine the amount of recovery to which plaintiff is entitled. The testimony showed that approximately 89% of the construction was completed and payments totalling $29,760 were made. On the basis of the work completed defendant was obligated to pay $33,108.00. When the amount actually paid is taken from the amount due for completed work the figure remaining is $3,348.00. Four thousand one hundred dollars, the difference between the full contract price and the $33,108.00 is the amount against which the set-off for labor not performed and materials not used is applied. In addition, there will be a number of other items which will be deducted from the amount owed to plaintiff.

██ Defendant testified that the materials and labor for the remaining 11% of the construction would have cost $605.00. This will be applied against the $4,100.00 figure. Set-off will also be allowed for $382.00 for the water heater tank and pump which were removed; $200.00 for the thibet tree removed and for which plaintiff agreed to allow credit; $50.00 for the removal of plaintiff's trailer from defendant's land; $60.00 for water; $30.00 for the exterminator; and $78.00 the reasonably necessary cost to conform the electrical service wire to building code requirements. The total $1,405.00 which when subtracted from $4,100.00 produces a figure of $2,695.00. When added to the $3,340.00 for work completed and the $1,289.00 for extras, this results in a total award to plaintiff of $7,324.00.

The Court declines to grant interest in this case, because of the relative balance of the equities which had to be considered. See RESTATEMENT (SECOND) OF CONTRACTS § 354(2), comment d. For the same reasons, the Court, in its discretion, declines to award attorney's fees and costs to either party.