DAVIS, Circuit Judge.
 

 The question is whether the Farmers Home Administration (FmHA), which guaranteed 90% of a loan made by a Michigan bank (the lender) to a private borrower, is liable to appellee First National Bank (FNB), the subsequent purchaser of the guaranteed part of the loan, for extra payments due after the borrower’s default. The United States Claims Court held that the United States (on behalf of its agency, FmHA) was so liable
 
 (First Nat’l Bank, Lexington, Tennessee v. United States,
 
 12 Cl.Ct. 719 (1987)) and the Government appeals. We reverse.
 

 I.
 

 The loan of $1,000,000 was made in July 1980 by the Houghton National Bank (lender) to Northern Industrial Sales and Service, Inc. (borrower). FmHA guaranteed 90% of that loan. FNB shortly purchased the guaranteed portion of the loan. The underlying promissory note provided that interest on the principal amount of the loan would accrue according to a variable inter
 
 *741
 
 est rate initially established at 13% and adjusted quarterly to the New York prime rate plus 2% points. In addition to the promissory note, the loan package included a FmHA Loan Note Guarantee, a FmHA Lender’s Agreement, an Assignment Guarantee Agreement, and a loan agreement between the borrower and the lender.
 

 In November 1981 the borrower requested a temporary payment moratorium on the loan through April 1982, to which FNB, the lender and FmHA agreed. The borrower was, however, unable to resume payments on the loan and in November 1982 FNB made demand upon FmHA for the unpaid principal and accrued interest calculated at the applicable promissory note interest rates. In January 1983, FNB received a check from the FmHA (in the amount of $1,086,602.38) in satisfaction of FNB’s demand.
 

 In September 1984, FNB made a second demand on FmHA for an additional $83,-414.53 in accrued interest; this demand was based on a clause in the loan agreement between the lender and the borrower, stating:
 
 “Default by Borrower.
 
 In the event of a default by the Borrower ... interest on the unpaid balance shall be at the rate of twenty-five percent (25%) per annum so long as a default occurs or ex-ists....” FNB claimed that its first demand on FmHA had inadvertently failed to take account of this 25% provision,
 
 [1]
 
 and the loan had been in default from October 26, 1981 through January 19, 1983 (when FNB received FmHA’s payoff check).
 

 FmHA refused payment of the additional sum, and FNB brought this suit in the Claims Court. The parties filed cross-motions for summary judgment, and that court, finding no genuine issue of material fact, held for FNB on the ground that (a) the additional payment sought was not a “late payment” prohibited by an FmHA regulation, and (b) FmHA’s obligation for the additional interest was based on the loan agreement between lender and borrower, which (the court held) was fully incorporated into FmHA’s guarantee.
 
 [2]
 

 II.
 

 In our view, the critical FmHA regulation (7 C.F.R. § 1980.22(b) (1980)) specifically provides that the additional payment demanded by FNB is outside the Government’s guarantee.
 
 [3]
 
 The first two sentences of the regulation deal with FmHA’s guarantee, forbidding recovery of “late payment charges.” The rest of the regulation, quoted in our footnote 3, provides for the conditions in which the lender (or subsequent holder) can assess “late payment charges” on the borrower. The Claims Court ruled that the term “late payment charges” referred only to flat charges, unrelated to principal and interest amounts, on any monthly payments made beyond a certain date—not to additional interest after default. However, the ordinary meaning in the English language of “late payment charges" is not so limited, and there is nothing in the record supporting the Claims Court’s restrictive reading of the regulation. On the contrary, the term facially covers
 
 any
 
 payment required after default or tied to a late (and unexcused) payment. This is, for instance, its meaning under the comparable provision of the Truth in Lending Act (TILA), 15 U.S.C.
 
 *742
 
 § 1601,
 
 et seq.,
 
 1638(a)(9), 1638(a)(8).
 
 Johnson v. McCrackin-Sturman Ford, Inc., 527
 
 F.2d 257, 266 (3d Cir.1975) (late payment charges “generally refer to specific pecuniary sums that are assessed against the borrower solely because of his failure to make his payments in a timely manner”—giving as an example an increase in the interest rate);
 
 Franklin v. Community Fed. Sav. & Loan Ass’n,
 
 629 F.2d 514, 517 (8th Cir.1980) (‘[E]ach increase [in the rate of interest as a “default, delinquency or similar charge’] can fairly be described as a charge levied by the creditor because of the debtor’s late payment.”). Similarly, Regulation Z under TILA (12 C.F.R. § 226.18(1)) has been officially interpreted by the staff of the Federal Reserve Board as including under “a late payment charge” an increase in the interest rate to the extent of the increase.
 

 The Government relies heavily on two recent parallel interpretations of FmHA practice by FmHA officials, statements which the Claims Court discredited because they were not longstanding but contemporaneous, and were both made in connection with the current controversy. We do not put as much weight on these
 
 ad hoc
 
 statements as does the Government, but we are impressed by the categorical statement under oath of John Bowles, a high FmHA official, that FmHA’s current interpretation—“including additional accrued interest attributable to the application of a higher rate of interest upon the indebtedness after default”—is “consistent with past policy and practice” of the agency (FmHA). That reasonable and uncontroverted administrative construction of the regulation (as employed by the FmHA in the past as well as the present) is entitled to respect by the court.
 
 Udall v. Tallman,
 
 380 U.S. 1, 4, 16-17, 85 S.Ct. 792, 795, 801-02, 13 L.Ed.2d 616 (1965).
 

 Nor does the Government’s application of the regulatory term “late payment” to the current case conflict with the policies beneath the regulation. The purpose was apparently to bar a lender or holder from both accruing late payment charges against the borrower and also making demand upon FmHA for payment in full (including the accrued late payment charges) pursuant to its guarantee. Conversely, the lender or holder can always, after default, protect itself by demanding and enforcing the Government’s guarantee.
 
 [4]
 

 For these reasons, we hold that the FmHA regulation (7 C.F.R. § 1980.22(b)) precludes the 25% post-default interest rate from being covered by the Government’s guarantee.
 

 III.
 

 We also disagree with the Claims Court’s ruling that the entire loan agreement (with its reference to 25% post-default interest) was incorporated into the Lender’s Agreement. That holding is based on the provision in the Lender’s Agreement (under the general heading “Servicing”) that the lender’s servicing responsibilities include:
 

 11. Obtaining from the borrower periodic financial statements under the following schedule:—See enclosed Loan Agreement [this reference to the ‘enclosed Loan Agreement’ is typed in]—. Lender is responsible for analyzing the financial statements, taking any servicing actions needed, and providing copies of statements and record of actions to the County Supervisor.
 

 This reference to the Loan Agreement is solely in connection with determining the schedule for the periodic financial statements borrower is to furnish and lender is to monitor. That specific purpose, totally unrelated to the current problem, was the only purpose for mentioning the Loan Agreement. As the Supreme Court said in
 
 Guerini Stone Co. v. P.J. Carlin Constr. Co.,
 
 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916):
 

 
 *743
 
 [I]n our opinion the true rule, based upon sound reason and supported by the greater weight of authority is that ... [in] cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.
 

 Moreover, the Lender’s Agreement also provided that “This agreement is subject to all the requirements of the applicable Sub-part of Title 7 CFR Part 1980,” which include the regulation (7 C.F.R. § 1980.22(b)) we have held (in Part II,
 
 supra)
 
 to preclude the 25% interest “late payment” from being embodied in the guarantee. Making the Lender’s Agreement “subject” to that regulation would invalidate the applicability, for the guarantee, of the late payment provision in the Loan Guarantee.
 
 [5]
 

 IV.
 

 Accordingly, we reverse the decision of the Claims Court and direct that FNB’s complaint be dismissed.
 
 [6]
 

 REVERSED.
 

 [1]
 

 . Under the formula set forth in the promissory note, the interest during the pre-default period was between 13% and 21.5%—and those were the percentages used in FNB’s first demand on FmHA.
 

 [2]
 

 . The Claims Court also awarded FNB pre-judgment interest on the $83,414.53 additional payment.
 

 [3]
 

 . The regulation states in relevant part:
 

 (b) Late payment charges.
 
 Late payment charges will not be covered by the Loan Note Guarantee.
 
 Such charges may not be added to the principal and interest due under any guaranteed note. Late payment charges may be made only if:
 

 (1) Routine. They are routinely made by the lender in all types of loan transactions.
 

 (2) Payments received. Payment has not been received within the customary time frame allowed by the lender ...
 

 (3) Calculating charges. The lender agrees with the applicant in writing that the rate or method of calculating the late payment charges will not be changed to increased charges while the Loan Note Guarantee is in effect.
 

 7 C.F.R. § 1980.22(b) (1980) (emphasis added).
 

 [4]
 

 . FNB also argues that the 25% interest-after-default might well be lower than the variable interest normally chargeable under the note— and it would be bizarre if the “late payment" interest were less than that ordinarily provided. The short answers are that (a) in this case the variable interest never reached 23% and (b) at least during the past half-century the prime interest rate has never reached 23%. It is plain that the parties believed that the 25% post-default interest charges would be higher than the variable rates provided in the note.
 

 [5]
 

 . FNB likewise argues that the promissory note itself made die loan agreement and its default interest clause part of the guaranteed transaction, but the provision on which appellee relies does not have that effect.
 

 [6]
 

 . Because of our disposition it is unnecessary to decide whether the Claims Court erred in awarding pre-judgment interest to FNB.